UNITED STATES of America, Plaintiff–Appellee,

v.

Sergio MORENO–FLORES, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Sergio Alberto RODRIGUEZ–MOLINA, Defendant–Appellant.

Nos. 93–10222, 93–10223.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1994.

Decided Aug. 31, 1994.

Francisco Leon, Tucson, AZ, for defendant-appellant Moreno–Flores; and Antonio F. Riojas, Richards & Pennington, Tucson, AZ, for defendant-appellant Rodriguez–Molina.

Thomas L. Fink, Asst. U.S. Atty., Tucson, AZ, for plaintiff-appellee.

Before: FERGUSON, NOONAN, and T.G. NELSON, Circuit Judges.

Opinion by Judge T.G. NELSON; Partial Concurrence and Partial Dissent by Judge FERGUSON.

T.G. NELSON, Circuit Judge:

## I

### OVERVIEW

Sergio Moreno–Flores (Moreno–Flores) and Sergio Alberto Rodriguez–Molina (Rodriguez–Molina) appeal their jury convictions for conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 (count one), and attempt to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count two). Moreno–Flores claims that the district court erred in refusing to suppress certain post-arrest statements because they were obtained in violation of his *Miranda* rights. Rodriguez–Molina argues that there was insufficient evidence to convict him on both counts of the indictment. We affirm the convictions of both defendants.

**1.** The individuals who drove the two vehicles to the car wash and another individual were initially observed at the scene but they walked away and were neither identified nor arrested.

## II

### FACTS AND PROCEDURAL HISTORY

The evidence viewed in the light most favorable to the Government is as follows. Federal agents received information that a black Ford Taurus and a white Chevrolet Celebrity were loaded with cocaine and would be crossing into the United States from Mexico through the port of entry at Nogales, Arizona on July 8, 1992. After establishing surveillance at that location, the agents observed two cars matching the description traveling eastbound from the port of entry. Agents followed those vehicles to a garage/car wash approximately one fourth of a mile from the border. They arrived at the car wash at around 2:00 p.m.

The agents saw Rodriguez–Molina[1] constantly moving around the Taurus and Celebrity. Soon thereafter, codefendant Juan Pelayo–Silva[2] arrived and spoke to Rodriguez–Molina and another man for about five minutes. The unidentified man moved the Celebrity and Taurus to different locations in the car wash area and then watched the cars for two hours with Rodriguez–Molina. They drove away from the area in a white pickup at 4:00 p.m., leaving the Celebrity and Taurus at the car wash for an additional two and one half hours. At trial, agents testified that it is common practice for individuals who import drugs to leave a vehicle loaded with drugs in an area and then back away from the car in order to determine whether it draws attention from law enforcement officers.

The unidentified man then returned to the car wash around 6:30 p.m. and backed the Taurus up against a wall. Soon thereafter, Pelayo–Silva, Moreno–Flores, and Rodriguez–Molina arrived at the car wash in a green Buick. A tow truck with a flatbed soon arrived.

Pelayo–Silva spoke with the driver and handed him a piece of paper. They put the Taurus on the flatbed and Pelayo–Silva re-

**2.** Although Pelayo–Silva has appealed his conviction, that appeal was not consolidated with this appeal.

turned to the green Buick where Rodriguez–Molina and Moreno–Flores were waiting. The tow truck made a detour to a nearby service station with the Buick following. The truck then headed north on the interstate toward Tucson with the Buick again following. Moreno–Flores was driving the Buick; Pelayo–Silva was the passenger; and Rodriguez–Molina was sitting in the back seat.

The Buick jockeyed back and forth around the tow truck on the interstate, varying its speed. Appellants would speed up and slow down, passing other cars, including the agents' surveillance cars. At one point, appellants passed one of the agents conducting surveillance and positioned themselves between the agent's car and the tow truck. They exited the interstate, made a U-turn on the road where they had exited and then, without stopping, returned to the interstate and began driving behind the agents. When the Buick pulled up beside Agent Dunlap's vehicle, Rodriguez–Molina, who was in the back seat, looked over at Dunlap. Dunlap was certain that he and the other agents had been identified.

The agents contacted the Arizona State Patrol (ASP) and had the ASP conduct a traffic stop in order to separate the Buick from the tow truck and to protect the agents. The ASP conducted the stop, detained the appellants for fifteen minutes, and identified the occupants. The agents continued to follow the tow truck to a Church's Fried Chicken parking lot in Tucson. After waiting approximately ten or fifteen minutes, the agents approached the truck and spoke with the driver who gave the agents the piece of paper Pelayo–Silva had given him. The appellants arrived soon thereafter and Moreno–Flores approached the tow truck. He told the driver to take the truck with the Taurus across the street to an apartment complex (Tamarack). As an agent was arresting Moreno–Flores, Pelayo–Silva and Rodriguez–Molina attempted to flee in the Buick. They were arrested and the agents found a key to one of the Tamarack apartments in Pelayo–Silva's possession. That apartment was leased to Moreno–Flores for six months and was empty with no evidence that anyone was living there.

The agents found 200 kilograms of cocaine in the trunk of the Taurus. The cocaine was divided into one kilogram packages wrapped in colored plastic with each package containing a computer label and a "received" mark on it. The next day (July 9), after waiting to determine whether anyone would retrieve the Celebrity, the agents found another 200 kilograms of cocaine in the Celebrity's trunk. The cocaine was packaged and labeled in the same manner as the cocaine found in the Taurus.

Pelayo–Silva admitted that he knew there was cocaine in the Taurus. He also stated that he had instructions to wait at the apartment for other individuals who would retrieve the cocaine. He was to receive $5,000 for his part in the scheme. Moreno–Flores also admitted knowing there were drugs in the Taurus, but he thought the Taurus contained marijuana and not cocaine. He told Agent Dunlap that he was not the "big guy" and that he was to receive $2,500.

A federal grand jury returned a two-count indictment charging Rodriguez–Molina, Moreno–Flores and Pelayo–Silva with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 (count one), and attempt to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count two). Trial commenced on December 14, 1992, and the jury returned guilty verdicts as to all defendants on all counts. The district court sentenced Rodriguez–Molina to 151 months imprisonment on both counts, to run concurrently. It sentenced Moreno–Flores to 235 months imprisonment on both counts, also to run concurrently.

Moreno–Flores claims that the district court erred in refusing to suppress certain post-arrest statements because they were obtained in violation of his *Miranda* rights. Rodriguez–Molina argues that there was insufficient evidence to convict him on both counts of the indictment.

### III

### DISCUSSION

#### A. MORENO–FLORES

##### 1. *Factual Background*

Moreno–Flores moved to suppress certain post-arrest statements based upon the fol-

lowing facts. After he was arrested on July 8, Agent Dunlap advised Moreno–Flores of his *Miranda* rights in both English and Spanish. Moreno–Flores stated that he understood those rights and he immediately invoked his right to remain silent; however, Dunlap testified that Moreno–Flores never invoked his right to an attorney. Dunlap then asked Moreno–Flores whether there were any other individuals in the vicinity with firearms who could pose a threat to the officers. Moreno–Flores responded that he was unaware of any other people in the area.[3] After Moreno–Flores was booked, Dunlap transported him to the Border Patrol office. During the ride, Dunlap told Moreno–Flores that the agents had seized about 600 pounds of cocaine and that Dunlap was interested in furthering the investigation. Dunlap also told Moreno–Flores that he was in serious trouble and that he was facing a lengthy prison sentence. Dunlap told Moreno–Flores that after he had an opportunity to consult with his attorney, Dunlap wanted to obtain information from him about other individuals who might be involved in cocaine distribution. Dunlap testified that he did not intend to speak with Moreno–Flores until after Moreno–Flores had consulted his attorney.

Moreno–Flores did not make any statements on July 8. The following morning when Dunlap picked Moreno–Flores up to transport him to court, Dunlap asked Moreno–Flores how his night was. A few minutes later, Moreno–Flores said, "Look, I was just going to get paid $2,500 to help Pelayo." Dunlap again advised Moreno–Flores that he had the right to remain silent. Dunlap explained to him that because he had invoked his right to remain silent, Dunlap was not going to question him. Although Dunlap did tell Moreno–Flores again that he had the right to remain silent, he did not repeat a *Miranda* warning. Moreno–Flores then stated:

Well, after you said it was cocaine, last night, I wanted you to know that it was just marijuana, I thought it was just marijuana, excuse me, and I wanted you to know that I'm not the big guy in this thing. I was just helping Pelayo.[4]

The district court denied Moreno–Flores' motion to suppress, reasoning that his statements on the day after the arrest were voluntary. Moreno–Flores argues that the district court erred in denying his motion to suppress. We disagree.

#### 2. *Standard of Review*

 The district court's denial of a motion to suppress is reviewed *de novo*. *United States v. Khan*, 993 F.2d 1368, 1375 (9th Cir.1993). As in this case, when there is no factual dispute as to whether *Miranda* warnings were given, what questions were asked and what answers were given, whether the defendant was subjected to interrogation is a mixed question of law and fact reviewed *de novo*. *United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir.1986); *cf. United States v. Thierman*, 678 F.2d 1331, 1334 (9th Cir.1982) (whether police conduct constitutes "interrogation" is reviewed for clear error).

#### 3. *Post–Arrest Statements*

There is no dispute that Moreno–Flores was in custody at all relevant times; that immediately after he was arrested, he was advised of his *Miranda* rights; and that he thereafter invoked his right to remain silent. Moreno–Flores contends that the statements he made to Agent Dunlap (Dunlap) on July 9 were the product of interrogation which occurred on July 8, after he had invoked his right to remain silent. We conclude that Moreno–Flores' post-arrest statements were not the product of interrogation and affirm the district court's denial of his motion to suppress.

 A defendant who is in custody must be given *Miranda* warnings before police officers may interrogate him. *Disla*, 805 F.2d at 1347. Once such warnings are given and the defendant invokes his right to remain silent, the admissibility of statements

---

**3.** The Government did not offer this exchange at trial; instead, codefendant Pelayo–Silva offered these statements during his cross-examination of Dunlap. Moreno–Flores did not object.

**4.** At trial, the Government introduced this statement in redacted form to delete any reference to Pelayo–Silva in order to avoid *Bruton* problems.

obtained thereafter depends upon whether the defendant's right to cut off questioning was "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975).

■ Interrogation is defined not only as express questioning but its "functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The functional equivalent of interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301, 100 S.Ct. at 1690 (footnote omitted). We use an objective test to determine whether questioning constitutes interrogation. *See, e.g., United States v. LaPierre,* 998 F.2d 1460, 1466–67 n. 6 (9th Cir.1993). Although the officer's subjective intent is relevant, it is not decisive, *Disla,* 805 F.2d at 1347, because in determining whether interrogation occurred, the focus is upon the defendant's perceptions. *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90. Nonetheless, the police are not held accountable for the unforeseeable results of their words or actions. *Id.* at 301–02, 100 S.Ct. at 1689–90.

■ On the day of Moreno–Flores' arrest and after he invoked his right to remain silent, Dunlap told him that the agents had seized approximately 600 pounds of cocaine and that Moreno–Flores was in serious trouble. Moreno–Flores did not respond. These statements were not express questions. Nor did they constitute the functional equivalent of interrogation. *See Shedelbower v. Estelle,* 885 F.2d 570, 573 (9th Cir.1989), *cert. denied,* 498 U.S. 1092, 111 S.Ct. 975, 112 L.Ed.2d 1060 (1991). In *Shedelbower,* this court held that statements to a suspect that his accomplice had been arrested and that the victim had identified the suspect, even though that latter statement was untrue, did not constitute the functional equivalent of interrogation. *Id.* at 572–73. *Shedelbower* reasoned that those statements "did not call for nor elicit an incriminating response. They were not the type of comments that would encourage [the suspect] to make some spontaneous incriminating remark." *Id.* at 573.

Similarly, in *Innis,* the Supreme Court held that two officers' dialogue in the presence of the defendant regarding the possibility that a handicapped child would find the gun the defendant had used in committing a murder and a robbery did not constitute interrogation in violation of *Miranda. Innis,* 446 U.S. at 302–03, 100 S.Ct. at 1690–91. Like *Shedelbower* and *Innis,* Dunlap's statements on July 8 did not invite a response from Moreno–Flores.

Furthermore, *Innis* also excludes from the definition of interrogation words or actions "normally attendant to arrest and custody." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689. "[T]his circuit has suggested that when an officer informs a defendant of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody." *United States v. Crisco,* 725 F.2d 1228, 1232 (9th Cir.) (officer's post-arrest statement to defendant about undercover officer previously showing defendant $60,000 with which he was to purchase cocaine was intended to inform defendant of circumstances and not to elicit incriminating response), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). Dunlap's statements are also properly characterized as statements normally attendant to arrest and custody because they informed Moreno–Flores of the circumstances of his arrest and contributed to an intelligent exercise of his judgment. *See Thierman,* 678 F.2d at 1334 n. 3 (listing cases decided prior to *Innis* which suggest, for example, that officer explaining to suspect extensive evidence against him is attendant to arrest and custody, citing *United States v. Pheaster,* 544 F.2d 353, 368 (9th Cir.1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977)); *see also United States v. Payne,* 954 F.2d 199, 202 (4th Cir.) ("[I]nterrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."), *cert. denied,* — U.S. —, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992).

Dunlap's statements on July 8 did not call for nor elicit an incriminating response. The

fact that they may have struck a responsive chord, or even that they may have constituted "subtle compulsion" is insufficient to find that they were the functional equivalent of interrogation. *See Innis*, 446 U.S. at 303, 100 S.Ct. at 1690–91. Moreno–Flores has failed to establish that Dunlap should have known his statements were reasonably likely to elicit an incriminating response. *See id.* Indeed, Moreno–Flores did not make any statements in response to Dunlap's comments on July 8. Further, Dunlap testified that he did not intend to speak with Moreno–Flores until after he had consulted an attorney.[5] *See Crisco*, 725 F.2d at 1232 ("The agent's intent in making the remarks, while not conclusive, is relevant in determining whether the remark was reasonably likely to elicit an incriminating response.").

■ Nor did Dunlap's question about how Moreno–Flores' night was on July 9 constitute interrogation. In response to Dunlap's question, Moreno–Flores stated that he was being paid $2,500 to help Pelayo–Silva. Dunlap could not have foreseen that his innocuous question about how Moreno–Flores' evening was would elicit an incriminating response. *See Innis*, 446 U.S. at 301–02, 100 S.Ct. at 1689–90 (police not held accountable for unforeseeable results of their words or actions). After Moreno–Flores' initial statement, Dunlap again advised Moreno–Flores that he had the right to remain silent and that Dunlap would not question him. Moreno–Flores then stated that he believed that there was marijuana and not cocaine in the trunk and that he was not the "big guy." Dunlap reassured Moreno–Flores that he did not believe Moreno–Flores was the "big crook" and he advised Moreno–Flores to meet with his attorney after which Dunlap would be interested in obtaining information from him. Moreno–Flores did not make any additional statements and the statements he did make were voluntary.

Moreno–Flores initiated the discussion and once he was advised of his right to remain silent, he chose to continue making statements. The totality of circumstances indicate that the statements were the product of Moreno–Flores' uncoerced choice based upon an understanding of his rights. *See Shedelbower*, 885 F.2d at 574 (citing *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 856–57, 93 L.Ed.2d 954 (1987)). *Miranda* does not prohibit the use of a defendant's voluntary statements. *See Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Notwithstanding Dunlap's efforts, Moreno–Flores continued to volunteer statements. Therefore, because his statements were voluntary, the district court did not err in denying the motion to suppress the statements.

■ Finally, Moreno–Flores' reliance upon an Eleventh Circuit case, *United States v. Gomez*, 927 F.2d 1530 (11th Cir.1991), is misplaced for two reasons. First, unlike Flores in this case, the defendant in *Gomez* requested an attorney. The evidence does not establish that Moreno–Flores invoked his right to counsel. Where a defendant invokes the right to counsel, questioning must cease until an attorney is present, unless the defendant initiates the exchange. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85. However, when only the right to remain silent is invoked, as in the present case, there is no similar requirement that questioning cease until an attorney is present. *See Mosley*, 423 U.S. at 104 n. 10, 96 S.Ct. at 326–27 n. 10; *see also Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885. Rather, the standard is as set forth above, i.e., whether the defendant's right to cut off questioning was "scrupulously honored."

Second, in *Gomez*, it was no more than a few minutes after the defendant invoked his right to counsel that the officers interrogated him and obtained an incriminating response. *Gomez*, 927 F.2d at 1536. The Eleventh

---

5. The dissent states that "Dunlap made veiled threats that, if Moreno–Flores did not cooperate by giving up names of other individuals who were involved in cocaine distribution, Moreno–Flores would face a lengthy prison term." Dissent op. at 1173. We disagree with the dissent's characterization of Dunlap's statements as "veiled threats." Rather, Dunlap advised Moreno–Flores of circumstances which would contribute to an intelligent exercise of his judgment. Moreover, Dunlap made it clear that he did not want to discuss the matter until *after* Moreno–Flores met with his attorney.

Circuit found that the agent's statements regarding a possible sentence and the benefits of cooperation were reasonably likely to elicit an incriminating response. *Id.* at 1538. However, as noted above, this circuit and others have concluded that statements such as those in *Gomez* fall outside the definition of interrogation. *See Thierman,* 678 F.2d at 1334 n. 3; *see also Payne,* 954 F.2d at 202. As we have concluded, Moreno–Flores' post-arrest statements were not the product of interrogation and his right to cut off questioning was "scrupulously honored." Accordingly, we affirm the district court's denial of his motion to suppress.[6]

### B. RODRIGUEZ–MOLINA: SUFFICIENCY OF EVIDENCE

#### 1. *Conspiracy*

 There was sufficient evidence to support the existence of a conspiracy in this case. *See United States v. Penagos,* 823 F.2d 346, 348 (9th Cir.1987) (To prove a conspiracy, the Government must establish: "1) an agreement to accomplish an illegal objective, 2) coupled with one or more acts in furtherance of the illegal purpose, and 3) the requisite intent necessary to commit the underlying substantive offense."). The issue is whether there is sufficient evidence to establish that Rodriguez–Molina was a member of that conspiracy. We find that his participation in countersurveillance activities was sufficient to establish his connection to the conspiracy. *See United States v. Mares,* 940 F.2d 455, 458 (9th Cir.1991) ("Evidence of even a slight connection, if proven beyond a reasonable doubt, is sufficient to convict a defendant of knowingly participating in an established conspiracy."). Although such a connection may be inferred from circumstantial evidence, mere proximity to the scene is insufficient to establish the connection. *Id.*

 "Counter-surveillance activities qualify as acts in furtherance of a conspiracy." *Penagos,* 823 F.2d at 348. We have identi-

fied several factors which are relevant to the sufficiency determination when it is based upon countersurveillance activities, including: (1) whether countersurveillance activities occurred when the risk of detection and capture was the greatest; (2) the number of occasions when defendant was present; (3) whether the evidence established particular persons or objects who were the objects of the defendant's countersurveillance; and (4) evasion of capture. *Id.* at 349.

Although we reversed the conviction in *Penagos, id.* at 349–50, the factors outlined in that case support our sufficiency finding in the present case. First, Rodriguez–Molina's countersurveillance activities occurred when the risk of detection was high, both at the car wash and while following the Taurus to the Church's Fried Chicken parking lot.

Second, unlike *Penagos* where the defendant was present on only one of three occasions when known co-conspirators were loading or unloading cocaine, Rodriguez–Molina was present during all phases of the investigation which ultimately led to his arrest. After the Taurus and Celebrity crossed the border into the United States from Mexico, both vehicles arrived at a car wash about one-fourth of a mile from the border. Soon thereafter, Rodriguez–Molina spoke with Pelayo–Silva, who was later found to be a co-conspirator. Rodriguez–Molina watched the Taurus and Celebrity (each car containing 200 kilos of cocaine) for about two hours. He then drove away from the car wash, leaving the cars for an additional two and one-half hours. At trial, agents testified that it was common practice for individuals who import drugs to leave vehicles loaded with drugs in an area and then back away from them in order to determine whether they draw attention from law enforcement officers. Finally, Rodriguez–Molina was a passenger in the car conducting countersurveillance during the drive to Tucson. At one point the car passed Dunlap, exited the interstate, made a U-turn without stopping and returned to the inter-

---

6. Moreno–Flores also argues that his right to remain silent was violated when, immediately after he invoked that, Dunlap asked him if there were any other individuals in the area and to which he responded that there were not. The Government did not offer this exchange at trial, a

fact he concedes; instead, codefendant Pelayo–Silva offered these statements during his cross-examination of Dunlap. Moreno–Flores did not object. Accordingly, he has waived that argument on appeal. Nor do we find that the error, if any, constitutes plain error.

state and got behind Dunlap. The car then pulled up alongside Dunlap, at which point Rodriguez–Molina was seen examining Dunlap and his car. The evidence, viewed in the light most favorable to the Government, indicates that Rodriguez–Molina was a lookout.

The third *Penagos* factor also supports our decision to sustain the conspiracy conviction. The evidence establishes the particular objects, persons and activities which were the subject of Rodriguez–Molina's countersurveillance. Finally, unlike the defendant in *Penagos,* Rodriguez–Molina (along with Pelayo–Silva) attempted to evade capture when Moreno–Flores was arrested. *See id.* at 349.

As additional support for reversal, Rodriguez–Molina cites two recent cases in which we held that there was insufficient evidence to sustain conspiracy convictions. *See United States v. Bautista–Avila,* 6 F.3d 1360 (9th Cir.1993); *see also United States v. Ramos–Rascon,* 8 F.3d 704 (9th Cir.1993). Unlike the defendants in *Bautista–Avila* and *Ramos–Rascon,* we cannot say that Rodriguez–Molina's conduct is consistent with that of someone who was "unwittingly associating with individuals involved in a drug conspiracy." *See Bautista–Avila,* 6 F.3d at 1363. As we outlined above, Rodriguez–Molina was involved during all stages of the conspiracy to import two carloads of cocaine into the United States. Moreover, his involvement occurred during the most risky phases of importation. Unlike *Bautista–Avila* and *Ramos–Rascón,* the evidence against Rodriguez–Molina is more than "strongly suggestive" and is sufficient to establish beyond a reasonable doubt that he was engaged in wrongdoing rather than innocent behavior. *See Ramos–Rascon,* 8 F.3d at 710.

Rodriguez–Molina's conduct, when viewed in context, is consistent with countersurveillance and supports an inference of guilt. *See Mares,* 940 F.2d at 458–59. Accordingly, we find that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could conclude beyond a reasonable doubt that Rodriguez–Molina was guilty of the conspiracy as charged in count one. *See Penagos,* 823 F.2d at 347.

2. *Possession*

Rodriguez–Molina also argues that there was insufficient evidence to convict him of possession with intent to distribute cocaine as charged in count two. We note that Rodriguez–Molina was convicted of *attempted* possession with intent to distribute. The judgment of conviction indicates that Rodriguez–Molina was convicted of possession with intent to distribute. However, the judgment does state that he was convicted "as charged in Count 2 of the indictment," which charges him with attempted possession.

██ To sustain a conviction for attempted possession of cocaine with intent to distribute, the Government must prove that the defendant "had culpable intent and that he took a 'substantial step' towards the commission of the crime, which step strongly corroborates the appellant's criminal intent." *United States v. Scott,* 767 F.2d 1308, 1311 (9th Cir.1985). Preparatory acts do not constitute attempt. *Id.* Conduct punishable as attempt "must be necessary to the consummation of the crime and of such a nature that a reasonable observer, viewing it in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *United States v. Runco,* 873 F.2d 1230, 1232 (9th Cir.1989) (internal quotations omitted).

██ Possession with intent to distribute cocaine requires the Government to prove that the defendant knowingly possessed the cocaine with intent to distribute it. *United States v. Walitwarangkul,* 808 F.2d 1352, 1353 (9th Cir.), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1909, 95 L.Ed.2d 515 (1987). Possession may be based upon co-conspirator liability, aiding and abetting, or the exercise of dominion and control over the contraband. *Mares,* 940 F.2d at 460. Hence, in order to establish attempted possession with intent to distribute, the Government must establish that Rodriguez–Molina took substantial steps toward committing that crime.

██ Because we conclude that there is sufficient evidence to establish Rodriguez–Molina's involvement in the conspiracy, we sustain his conviction for attempted possession on the co-conspirator theory of liability.

*See id.; see also United States v. Sanchez–Mata,* 925 F.2d 1166, 1168 (9th Cir.1991). Moreover, attempted possession with intent to distribute requires less proof than that required for possession because the Government need only prove that the defendant took substantial steps toward commission of the crime. After reviewing the evidence, we find that Rodriguez–Molina took substantial steps toward possessing the cocaine.

AFFIRMED.

FERGUSON, Circuit Judge, concurring in part and dissenting in part.

I dissent in the Moreno–Flores case and concur in the Rodriguez–Molina case. Once a defendant invokes his right to remain silent, it must be scrupulously honored. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). All interrogation must cease. Interrogation is express questioning or its "functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). Any statements or questions that are reasonably likely to elicit an incriminating response are prohibited. 446 U.S. at 301, 100 S.Ct. at 1689–90. The focus is on the defendant's perception of the officer's statements, although the intent of the officer is relevant. 446 U.S. at 301, 100 S.Ct. at 1689–90; *United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986). "Interrogation tactics need not be violent or physical in nature to be deemed coercive. Psychological coercion is equally likely to result in involuntary statements, and thus is also forbidden." *Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992).

When Moreno–Flores was arrested on July 8, he invoked his right to remain silent. While Agent Dunlap transported Moreno–Flores to the Border Patrol Office, Dunlap made several statements which, according to his own characterization, were designed to elicit Moreno–Flores' cooperation and further the investigation. Dunlap explained that 600 pounds of cocaine had been seized and that the appellant was in serious trouble. Dunlap made veiled threats that, if Moreno–Flores did not cooperate by giving up names of other individuals who were involved in cocaine distribution, Moreno–Flores would face a lengthy prison term. Dunlap then left Moreno–Flores at the Border Patrol Office where he spent the night.

The next morning, Dunlap transported Moreno–Flores to court. When Moreno–Flores got into the car Dunlap asked "how was your night?" In response to the statements made the night before, Moreno–Flores stated "after you said it was cocaine, last night, I wanted you to know that ... I thought it was marijuana ... I'm not the big guy in this thing."

The district court denied Moreno–Flores' motion to suppress these statements. This court must now decide, *inter alia,* whether Dunlap's comments, in context, constituted interrogation of Moreno–Flores after he invoked his right to remain silent. It is important for the court to recognize when deciding whether an officer's questions and comments constitute interrogation, that the same words that can be coercive and threatening during an arrest, can appear reasonable when repeated in the calm, composed atmosphere of a courtroom and can even convey that the officer was trying to protect the defendant's rights. In this case, however, it is clear that Moreno–Flores' statements were the result of Dunlap's improper interrogation.

Dunlap testified that his words were designed to impress upon Moreno–Flores that "the case was pretty serious," and to elicit his cooperation. He wanted Moreno–Flores to know that "it would be helpful to me if he would provide information or tell me what he knew about whether there was more cocaine in the area or what other people were involved, people that I didn't have in custody. Whose cocaine it was." Dunlap also testified that he wanted Moreno–Flores to cooperate only after he spoke to an attorney. Thus, Dunlap designed his comments to elicit cooperation but then believed that Moreno–Flores would cooperate only after speaking to an attorney.

In its opinion, the majority divides Dunlap's statements into two parts. It analyzes the statements made on July 8 separately from those made on July 9 and concludes

that neither constituted interrogation. This analysis misses the mark in that all of Dunlap's statements must be evaluated in terms of the totality of the circumstances, not just as individual parts.

The question before this court is whether, focusing on Moreno–Flores' perception and considering the totality of Dunlap's comments, were such comments reasonably likely to elicit an incriminating response. This is not a difficult issue to resolve. Dunlap admitted that he was attempting to elicit an incriminating response from Moreno–Flores. Dunlap testified, however, that he wanted Moreno–Flores to cooperate only after he spoke to an attorney.

The majority concludes that, because Dunlap sought only Moreno–Flores' *future* cooperation, Dunlap's comments were not reasonably likely to elicit an incriminating response. I disagree. Dunlap's words were designed to elicit cooperation from Moreno–Flores. It does not matter that Dunlap made a distinction in his own mind between future and immediate cooperation. Our focus must be on Moreno–Flores perception of the comments and whether this perception was reasonable.

By focusing on Dunlap's hope to obtain information from Moreno–Flores only after he spoke to an attorney, the majority pays mere lip service to the objective test that focuses on the reasonableness of Moreno–Flores' perception. Instead the majority applies a subjective test that emphasizes Dunlap's intent in making the comments.

Applying the proper test, it was not unreasonable that Moreno–Flores did not interpret Dunlap's words such that they sought cooperation only in the future. Moreno–Flores listened to the words Dunlap used and he believed his best hope was to cooperate immediately. Thus, focusing on Moreno–Flores perception, Dunlap's words, taken in context, were reasonably likely to elicit incriminating statements.

The admission of Moreno–Flores' statements is subject to a harmless error standard. *See Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Following Justice Kennedy's concurrence in *Fulminante*, I would find that admitting Moreno–Flores' statements was not harmless error because the statements amounted to a full confession.

> [T]he court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact, as distinguished, for instance, from the impact of an isolated statement that incriminates the defendant only when connected with other evidence. If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case.

499 U.S. at 313, 111 S.Ct. at 1266.

Because I would hold that it was not harmless error to admit Moreno–Flores' coerced confession, I dissent in part and concur in part.