CAVANAGH, J.
(dissenting). This case raises the issue of whether defendant, who was 17 years old at the time, was subjected to “interrogation” after invoking his Fifth Amendment right against compelled self-incrimination, contrary to Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In my view, defendant was improperly subjected to the “functional equivalent” of interrogation under Rhode Island v Innis, 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 *210 (1980); thus, I would reverse the judgment of the Court of Appeals, reinstate the trial court’s order suppressing defendant’s incriminating statements, and remand this case to the trial court for proceedings consistent with this opinion.
The United States and Michigan Constitutions guarantee the right against compelled self-incrimination. US Const, Am V; Const 1963, art 1, § 17. The United States Supreme Court has explained that “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” Miranda, 384 US at 444. The necessary “procedural safeguards” are embodied in the now familiar Miranda warnings. Innis, 446 US at 297; Colorado v Spring, 479 US 564, 572; 107 S Ct 851; 93 L Ed 2d 954 (1987). The United States Supreme Court has “consistently . . . accorded a liberal construction” to the privilege against self-incrimination, Miranda, 384 US at 461, while still recognizing that “[cjonfessions remain a proper element in law enforcement” and “[vjolunteered statements of any kind are not barred by the Fifth Amendment,” id. at 478. Indeed, not all statements obtained by the police after a person has been taken into custody are automatically considered the product of interrogation. Innis, 446 US at 299. Rather, interrogation “must reflect a measure of compulsion above and beyond that inherent in custody itself.” Id. at 300. However, if at any time “the individual indicates in any manner. . . that he wishes to remain silent, the interrogation must cease.” Miranda, 384 US at 473-474.
In this case, it is undisputed that defendant was in custody, was given Miranda warnings, and had invoked *211 his right to remain silent before he made incriminating statements. Thus, the primary issue in this case is whether defendant was subjected to custodial interrogation after invoking his right to remain silent. The United States Supreme Court has explained that interrogation includes “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,” id. at 444; see, also, Yarborough v Alvarado, 541 US 652, 661; 124 S Ct 2140; 158 L Ed 2d 938 (2004), but, in subsequent opinions, the Court has further explained that “interrogation” is not limited only to express questioning. Rather, certain “techniques of persuasion” may also amount to interrogation. Innis, 446 US at 299. Accordingly, “interrogation” includes either “express questioning or its functional equivalent.” Id. at 300-301.
Although caselaw provides little guidance regarding how to determine whether specific statements by the police amount to express questioning, Innis explained that if a police officer’s statement does not invite a response from the suspect, the statement does not amount to express questioning. Id. at 302. Although a communication asking someone for an answer obviously amounts to express questioning because it is a clear example of a remark that invites a response, Innis should not be interpreted to mean that only explicit or direct questions can amount to express questioning because other types of statements may also invite a response. Accordingly, police officers cannot remove their comments from the realm of express questioning merely by prefacing the comments with limiting phrases such as “I’m not asking you questions” or “I’m just telling you,” as Detective Brett Stiles did in this case. Although such qualifying statements might, in some situations, be relevant to a court’s consideration *212 of the totality of the circumstances, in my view merely prefacing a statement with “I’m not asking a question,” “I’m just telling you,” or other similar phrases should not be given significant weight because such statements do not magically transform what would otherwise be an express question into a constitutionally benign comment. For example, the statement “I’m not asking you a question, I’m just telling you I want to know why you killed those people” would clearly be an express question under Miranda and Innis because it invites a response, regardless of the interrogator’s use of a lead-in statement. See Innis, 446 US at 302.
Turning to the unique details of the statements at issue in this case, several characteristics of Stiles’s statements indicate that he was asking an express question of defendant. First, defendant and Stiles were the only two people in the interrogation room when Stiles made the statements. Thus, Stiles was obviously directing his statements to defendant. Second, when considered in context, the phrases “okay” and “all right” seem to invite defendant to respond by, at a minimum, acknowledging that he heard what Stiles had said. Third, after punctuating his statements with “okay,” Stiles paused for several seconds, as if waiting for a response from defendant. When defendant did not respond, Stiles followed up by stating, “All right?” which, again, could be interpreted as inviting a response from defendant.
On the other hand, I agree with the majority that other characteristics of Stiles’s statements weigh against the conclusion that the statements amounted to express questioning. Most notably, it is not unusual for people to use certain words or phrases repeatedly while speaking without intending for those words to have significant meaning. In fact, during the approximately *213 five-minute-long colloquy between Stiles and defendant, Stiles repeatedly used the phrases “okay” and “all right” to punctuate statements, apparently without intending to extract a response from defendant.
As the preceding discussion reveals, the totality of the circumstances surrounding Stiles’s statements allows for persuasive arguments in support of differing conclusions regarding whether Stiles subjected defendant to express questioning. However, I will assume arguendo, for purposes of this appeal only, that defendant was not subjected to express questioning because I believe that even if Stiles’s comments were not “express questions,” the comments nevertheless amounted to the “functional equivalent” of express questioning for the reasons discussed later in this opinion.
The “functional equivalent” of express questioning encompasses “any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Innis, 446 US at 301. An “incriminating response” is “any response — whether inculpatory or exculpatory — that the prosecution may seek to introduce at trial.” Id. at 301 n 5. Innis further explained that the requirement that the words or action be reasonably likely to elicit an incriminating response
focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. [Id. at 301.]
*214 However, the police “cannot be held accountable for the unforeseeable results of their words or actions . ..
Id. at 302. Accordingly, “the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.” Id.
The Innis Court made two additional important points regarding the definition of “interrogation.” First, the Court stated that although the suspect’s perception is the primary focus of the inquiry, the intent of the police is also relevant because “it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.” Id. at 301 n 7. Indeed, “where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.” Id.
Second, in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response, “[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor. . . .” Id. at 302 n 8.
Several opinions provide some examples that assist in establishing the boundaries of “interrogation” under the “functional equivalent” analysis for Miranda purposes. For example, in United States v Payne, 954 F2d 199, 202 (CA 4, 1992), the court concluded that “mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for Miranda purposes.” Likewise, Acosta v Artuz, 575 F3d 177, 191-192 (CA 2, 2009), cited several cases supporting the *215 premise that, generally, disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, does not constitute interrogation under Innis. See, also, United States v Moreno-Flores, 33 F3d 1164, 1169 (CA 9, 1994) (holding that the defendant was not interrogated when police informed him that drugs had been seized and that he “was in serious trouble”), People v McCuaig, 126 Mich App 754, 760; 338 NW2d 4 (1983) (finding no interrogation when an officer advised the defendant of the charges he was facing and described the events that resulted in the charge), and Fleming v Metrish, 556 F3d 520, 533 (CA 6, 2009) (permitting comments explaining the inculpatory evidence possessed by the police so that the suspect could “reassess his situation” and “make informed and intelligent assessments of [his] interests”) (quotation marks and citation omitted) (alteration in original).
The common thread running through these cases is that the police generally do not interrogate a suspect for purposes of Miranda if the comments merely provide the suspect with additional information about the course of the investigation and allow the suspect to reconsider his or her decision to invoke the right to remain silent. I agree with the majority that these cases are helpful to the extent that they show that some limited communication with the suspect regarding the case after the invocation of the Fifth Amendment right to remain silent may be permissible under Miranda. However, the general principle established by these cases does not, alone, resolve this case because Stiles’s expression of concern regarding the gun’s location “did not provide defendant with information about the charges against him, about inculpatory evidence the police possessed, or about witness statements.” White, 294 Mich App at 638 n 5 (SHAPIRO, J., dissenting). Nor did his comments “offer any new information that could *216 provide a basis for an intelligent reassessment of the defendant’s decision to remain silent.” Id. Accordingly, applying this line of cases to conclude that Stiles’s comments were not the functional equivalent of interrogation would erroneously expand the analysis beyond its intended scope of applicability.
Although Stiles’s comments do not fall into the categories of statements that are generally outside the scope of interrogation, I agree with the majority that this fact alone is not sufficient to label the comments “interrogation” under Innis. Rather, it is necessary to consider the Innis definition of “interrogation” in greater detail. Particularly important to deciding this case is (1) whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response from defendant and (2) how defendant perceived the comments, regardless of Stiles’s intent. See Innis, 446 US at 301; see, also, Stewart v United States, 668 A2d 857, 866 (DC, 1995) (explaining that applying Innis requires a court to “look[] at the facts from the point of view of what the police should have known would be the impact of the statements and, most importantly, how the suspect perceived them”).
The defendant in Innis was suspected of a murder committed with a gun, which had not been recovered. The defendant, who was under arrest and had been given Miranda warnings, was riding in a police car with three officers when one officer commented to another officer that there were many handicapped children in the area where the defendant was arrested. The officer further commented that he hoped that none of the children found the gun and hurt themselves. The second officer expressed his agreement. The defendant overheard the officers’ conversation and told the officers to turn the car around so that he could lead them to *217 the gun. The Court concluded that the officers’ conversation did not amount to the functional equivalent of interrogation, explaining that the officers’ comments occurred in the context of a “brief conversation” that “consisted of no more than a few offhand remarks.” Innis, 446 US at 303. The Innis Court also noted that the officers’ comments did not constitute a “lengthy harangue in the presence of the suspect,” nor were the comments “particularly ‘evocative.’ ” Id. Accordingly, Innis held that the suspect “was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.” Id.
In this case, the majority relies on its conclusion that the content of Stiles’s comments was similar to the content of the officers’ conversation in Innis to support reversing the trial court’s suppression of defendant’s incriminating statements. The majority emphasizes that, in Innis and in this case, the officers expressed concern regarding the whereabouts of a gun and the potential danger that it posed to others, and it notes that neither Innis nor this case presents a situation in which the officers engaged in a “lengthy harangue.”
While the majority is correct that there are some similarities between the officers’ statements in Innis and Stiles’s comments in this case, those similarities are not determinative. Rather, those similarities are only some of the facts that must be considered in order to determine how defendant perceived Stiles’s statements and whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response. See United States v Allen, 247 F3d 741, 765 (CA 8, 2001) (“Determining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly *218 whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given.”), vacated on other grounds 536 US 953 (2002). Thus, the mere fact that the statements have some similar content is not determinative: all the circumstances of each case must be considered when applying the principles enunciated in Innis.
The majority’s singular focus on the similarities in the content of the statements in Innis and this case fails to give proper consideration to the context in which the statements were made. And, in failing to consider the import of the context in which Stiles made the statements at issue, the majority all but ignores the primary considerations of the Innis case: the suspect’s perception of the officer’s statements and whether the officer should have known that his comments were reasonably likely to elicit an incriminating response. Specifically, it is critical to recognize that, unlike the comments in Innis, Stiles’s comments were made in a police interrogation room and were expressly directed to defendant, who was the only other person present when the statements were made. See Allen, 247 F3d at 765 (emphasizing the context in which the statements are made). This factor is significant in determining whether Stiles should have reasonably expected that defendant would make an incriminating response. Indeed, in In re EG, 482 A2d 1243, 1245 (DC, 1984), the court considered a situation in which an officer who was investigating an armed robbery arrested the defendant and, when no other officers were present, stated, “I wonder where the gun and money is.” In re EG compared the officer’s statements to the officers’ statements in Innis and concluded “without reservation that [the officer] should have known that his statement was reasonably likely to *219 elicit an incriminating response . Id. at 1248. In re EG differentiated the officer’s statements from the Innis officers’ statements by noting that “no other person was present” and that “there was no understandable explanation for [the officer’s] rhetorical question other than to elicit a response from [the suspect].” Id. In re EG reached this conclusion despite the officer’s testimony that he did not expect a response to his statement, explaining that “the definition of interrogation ‘focuses primarily upon the perceptions of the suspect, rather than the intent of the police.’ ” Id. at 1248 n 6, quoting Innis, 446 US at 301. Accordingly, regardless of whether Stiles subjectively expected defendant to respond to his comments, defendant could have reasonably perceived that, given the content and context of the comments, Stiles was seeking a response.
Similarly, two of the dissenting justices in Innis, who were “substantially in agreement with the Court’s definition of ‘interrogation,’ ” Innis, 446 US at 305 (Marshall, J., dissenting), concluded that the Innis officers’ remarks “would obviously have constituted interrogation if they had been explicitly directed to respondent,” id. at 306.[1] This is true because the difference between overhearing a conversation and being the intended recipient of a comment is significant. Specifically, one who overhears a conversation in which he or she is not involved is unlikely to perceive that conversation as seeking his or her input. Conversely, *220 when a comment is expressly directed at someone, the person to whom the comment is directed is reasonably likely to perceive that comment as seeking a response. Conversation does not, however, necessarily require that each participant in the conversation pose an explicit question in order for a response to be reasonably expected.
Rather than considering how the context affected defendant’s perception of Stiles’s statements and whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response, the majority prefers to speculate regarding Stiles’s subjective intent in making the statements and concludes that the statements merely reflected a “concern about the danger posed by the missing gun.” Ante at 205 n 8. See, also, ante at 201 n 4 (speculating that Stiles intended for his comments to spur defendant to inform defendant’s family of the gun’s whereabouts).[2] The majority’s analysis, however, fails to give proper weight to the primary principles of law established in Innis: “the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.” Innis, 446 US at 301 (emphasis added).[3]
*221 Likewise, the majority engages in a monumental effort to minimize the coercive atmosphere that defendant faced. For example, in attempting to distinguish this case from In re EG, the majority speculates that Stiles made the statements at issue out of “a genuine and legitimate concern about the danger posed by the missing gun,” whereas the officer in In re EG had no similar motive for his statements. Ante at 205 n 8. However, the officer in In re EG was in the process of arresting a person who was suspected of using a gun to commit a crime with a partner. Because the officer in In re EG did not immediately find a gun, it was possible that the defendant’s partner had the gun and the officer’s personal safety was in immediate danger. Thus, the officer arguably had an even more pressing and objectively verifiable “concern about the danger posed by the missing gun” than did Stiles. Nevertheless, In re EG held that the officer’s statements amounted to interrogation under Innis. Accordingly, I find unpersuasive the majority’s attempt to distinguish In re EG on this basis.[4]
More importantly, however, the majority’s parsing of the factual circumstances to distinguish In re EG from this case is irrelevant because the court in that case did not rely on any of the circumstances noted by the majority here in support of its conclusion that the officer’s statements amounted to the functional equiva *222 lent of interrogation. What is relevant is that the court in In re EG stated that the situation was “[ujnlike the situation in Innis” because “no other person was present” when the officer made the comments. In re EG, 482 A2d at 1248. In re EG concluded on the basis of that fact that the officer’s comments were “precisely [the] type of tactic . . . [that] is prohibited by Miranda” and, thus, the functional equivalent of interrogation under Innis. Id.
In re EG’s application of Innis is correct because, despite the majority’s unwillingness to consider it, the primary focus of an Innis analysis must be “upon the perceptions of the suspect, rather than the intent of the police.” Innis, 446 US at 301 (emphasis added). Thus, no matter how noble the officer’s intent, if the officer should have known that it was reasonably likely that the suspect would perceive the statements as seeking a response that requires the suspect to divulge incriminating information, the officer’s statements are the functional equivalent of interrogation.
Similarly, the majority concludes that Stiles’s comments were, at most, “subtle compulsion” because the comments were less “evocative” than the officers’ comments in Innis. In support of this conclusion, the majority relies on the fact that Stiles made no mention of handicapped children or God. Again, this view of Stiles’s statements ignores the context in which they were made; specifically, that the comments were unquestionably directed to defendant. As previously explained, depending on the context, a statement clearly directed to a specific person is reasonably likely to elicit a response from that person. Thus, while the content of Stiles’s statement may not have been particularly “evocative,” Stiles should have known that, given the context in which the statement was made,, it was rea *223 sonably likely that defendant would perceive the statement as seeking to evoke a response.
Additionally, Stiles did not simply express his desire that no one else be harmed by the gun and then leave the room. Rather, Stiles pressed defendant by adding “okay” and, after a pause, further adding “all right.” Although it is conceivable that these words did not amount to express questions for the reasons previously discussed, defendant could reasonably have perceived the words, along with the pause between them, as seeking a response on his part. The majority apparently rejects this possibility and instead assumes that Stiles was merely ensuring that defendant heard and understood his comments regarding the danger that the gun posed. See ante at 201-202. The majority fails to consider the next logical step in its analysis, however. Specifically, if Stiles was ensuring that defendant heard his statement, one must ask why Stiles made that effort. The most likely answer is that Stiles hoped that defendant would respond by divulging the gun’s location. Thus, even if Stiles’s motivation was purely altruistic as the majority speculates, he should have nevertheless known that his statement was reasonably likely to elicit an incriminating response from defendant. Accordingly, the statement satisfies the definition of the functional equivalent of interrogation from Innis because a suspect’s constitutionally protected rights cannot be cast aside simply because the questioning officer’s subjective intent may have been laudable.
The nature of Stiles’s comments is also relevant to determining how defendant perceived the comments and whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response from defendant. For example, Arizona v Mauro, 481 US 520, 529; 107 S Ct 1931; 95 L Ed 2d 458 *224 (1987), noted that Miranda and Innis held that subjecting a suspect to “compelling influences” or “psychological ploys” were techniques of persuasion that amount to interrogation when used in a custodial setting. Mauro also emphasized that
[i]n deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards [v Arizona, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981)]: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. [Id. at 529-530.]
Mauro’s analysis was based on Innis, which stated that “Miranda also included in its survey of interrogation practices the use of psychological ploys, such as to ‘posi[t]’ ‘the guilt of the subject/ to ‘minimize the moral seriousness of the offense,’ and ‘to cast blame on the victim or on society.’ ” Innis, 446 US at 299, quoting Miranda, 384 US at 450 (emphasis added) (alteration in original). Also, the Mauro Court explained that Innis
reviewed the police practices that had evoked the Miranda Court’s concern about the coerciveness of the interrogation environment. The questioned practices included ... a variety of psychological ploys .... None of these techniques involves express questioning, and yet the Court found that any of them, coupled with the interrogation environment, was likely to subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination. [Mauro, 481 US at 526 (quotation marks and citations omitted; emphasis added).]
Thus, the majority is incorrect that “Mauro simply noted that the defendant in that case had not been subjected to ‘psychological ploys.’ ” Ante at 204 n 7. Rather, Mauro held that the defendant had not been interrogated precisely because the defendant was not subjected to psychological ploys. See Mauro, 481 US at *225 529 (stating that the defendant was not subjected to psychological ploys and concluding, “[t]hus, [the defendant’s] volunteered statements cannot properly be considered the result of police interrogation”). Indeed, other jurisdictions have interpreted Miranda, Innis, and Mauro as holding that psychological ploys may constitute interrogation, depending on the circumstances of the case. See, e.g., Commonwealth v Larkin, 429 Mass 426, 431 n 4; 708 NE2d 674 (1999) (noting that the functional equivalent of express questioning has been construed as “including ‘psychological ploys’ likely to elicit [an incriminating] response”), citing Mauro, 481 US at 526.[5]
In this case, Stiles’s statements, which were expressly directed to defendant, played to the likelihood that defendant would respond to an expression of concern for the safety of others. Thus, the nature of Stiles’s statements had the characteristics of a psychological ploy that exerted a compelling influence on defendant because the comments implied that defendant was the only person who knew where the gun was located and, thus, implied that defendant had a respon *226 sibility to make that information known so that others would not be harmed.[6] The only way that defendant could make that information known, however, was to give an incriminating statement in response to Stiles’s statements. Thus, Stiles’s statements used what Miranda identified as one of the hallmarks of interrogation: “[t]he aura of confidence in [defendant’s] guilt [that] undermines [defendant’s] will to resist.” Miranda, 384 US at 455. Indeed, because the comments were expressly directed to defendant, Stiles placed defendant in a situation in which defendant “merely confirm[ed] the preconceived story the police [sought] to have him describe,” i.e., that defendant knew the location of the gun because he had used the gun to commit the murder.[7] Id. Accordingly, Stiles should have *227 known that his comments were reasonably likely to elicit an incriminating response because it was reasonably likely that defendant would perceive the comments as compelling a response in order to protect others, particularly because Stiles expressly directed his statements to defendant.[8] Finally, other courts have recognized that a defendant’s personal characteristics or relationship with the questioning officer might influence how that defendant perceives a police officer’s statements. For example, in Stewart, 668 A2d at 866, the defendant invoked his right to remain silent and, several hours later, a detective who had attended the same church as the defendant for many years took the *228 defendant to a jail cell. The detective told the defendant not to feel bad about the situation and that the other members of the church would not judge him and would be a support group for him. Several hours after the detective made the religion-themed statements to the defendant, the detective again visited the defendant and the defendant confessed. Stewart held that the religion-themed statements amounted to unlawful interrogation and rejected the prosecution’s argument that the detective’s statements were spontaneous, casual, and purely of a personal nature. Id. The Stewart court explained that the detective was “an experienced homicide detective . . . capable of exploiting an opportunity.” Id. Accordingly, “[n]o conversation concerning a criminal investigation between such a detective and a suspect can be said to be ‘purely personal.’ ” Id. Rather, the Stewart court determined that the “conversation can only be characterized as the first preparatory step of someone experienced in conducting interrogations.” Id. Similarly, In re EG, 482 A2d at 1248 n 6, noted the defendant’s youthfulness as one of the circumstances supporting the conclusion that the officer should have known that his statements were reasonably likely to elicit a response, and United States v Rivera-Ruiz, unpublished opinion of the United States District Court for the District of Minnesota, issued May 14, 2002 (Docket No. CR 02-57 ADMRLE), held that “[t]he [defendant's foreign status and likely unfamiliarity with U.S. constitutional rights” were relevant to determining how the defendant perceived the officer’s statements.
In this case, defendant was 17 years old when he was arrested, and he had no prior criminal convictions. Although any person in police custody might view the questioning officer as an authority figure and thus feel compelled to respond to the officer’s statements, defen *229 dant’s youth and inexperience with the criminal justice system are relevant factors in determining how defendant perceived Stiles’s comments. Because these factors, combined with the fact that Stiles’s comments implied that defendant had a responsibility to protect others, increased the likelihood that defendant would feel compelled to respect and comply with Stiles as an authority figure, I would conclude that Stiles should have known that his comments were reasonably likely to elicit an incriminating response.
In summary, despite the similarities between the content of Stiles’s comments in this case and the Innis officers’ statements, I believe that several important factors distinguish this case from Innis. First, Stiles expressly directed his statements to defendant; thus, it was more likely that defendant would perceive the statements as seeking a response. Likewise, Stiles should have known that by expressly directing the comments to defendant, it was reasonably likely that defendant would respond. Second, Stiles’s statements had the characteristics of a “psychological ploy” that exerted a “compelling influence” on defendant because the statements played to the likelihood that defendant would feel compelled to protect others. Third, several of defendant’s individual personal characteristics increased the likelihood that he would perceive Stiles’s comments as requiring a response.
Accordingly, from the totality of the circumstances, I would conclude that it was not “unforeseeable” that Stiles’s comments would result in an incriminating response from defendant. Innis, 446 US at 302. Rather, defendant could have reasonably perceived that Stiles expected a response, and Stiles should have known that his comments were “reasonably likely to elicit an incriminating response from [defendant].” Id. at 301. As a result, *230 I believe that defendant was improperly subjected to the functional equivalent of interrogation after invoking his Fifth Amendment right against compelled self-incrimination. Accordingly, I would reverse the judgment of the Court of Appeals and reinstate the trial court’s order suppressing defendant’s incriminating statements.

 I disagree with the majority that Justice Marshall’s Innis dissent is irrelevant. See ante at 206 n 9. Because Justice Marshall’s dissent substantially agreed with the majority’s definition of “interrogation,” Innis, 446 US at 305 (Marshall, J., dissenting), both opinions applied the same legal framework and simply reached differing conclusions regarding the specific facts at hand. Thus, I believe that Justice Marshall’s opinion, while not binding, is relevant and worthy of some consideration as this Court weighs the totality of the circumstances in this case.

 Notably, the record is devoid of any support for the majority’s speculation regarding Stiles’s subjective intent in making the statements at issue.

 Although Innis recognized that the officer’s intent “may well have a bearing” on the analysis, it also explained that the officer’s intent is most relevant “where a police practice is designed to elicit an incriminating response from the accused [because] it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.” Innis, 446 US at 301 n 7 (emphasis added). Thus, the majority’s speculative conclusion that Stiles did not intend to elicit an incriminating response is of little relevance because Stiles nevertheless should have known that his statement was reasonably likely to elicit an *221 incriminating response. See In re EG, 482 A2d at 1248 n 6 (concluding that the officer’s statement amounted to interrogation even though the officer testified that he did not expect a response to his statement).

 The majority’s conclusion that Stiles made the statements at issue “during a completely civil conversation with defendant,” ante at 206 n 8, is equally unpersuasive because that conclusion fails to recognize the reality of defendant’s circumstances. I believe that it is far more realistic and reasonable to conclude that most people would not perceive a one-on-one “discussion” with a homicide detective in a windowless police interrogation room to be a completely civil conversation.

 See, also, State v Northern, 262 SW3d 741, 753 (Term, 2008) (“[I]n a custodial setting, certain psychological ploys ... are ‘techniques of persuasion, no less than express questioning’ which ‘amount to interrogation.’ ”), quoting Innis, 446 US at 299, and citing Miranda, 384 US at 450; Edmonds v State, 955 So 2d 787, 807 (Miss, 2007) (Diaz, EJ., concurring) (concluding that the police conduct at issue was “ ‘precisely the kind of psychological ploy that Innis’s definition of interrogation was designed to prohibit’ ”), quoting Nelson v Fulcomer, 911 F2d 928, 935 (CA 3, 1990) (citations omitted); People v Rivas, 13 F3d 315, 319 (Colo, 2000) (‘‘Fractices identified as the functional equivalents of interrogation generally employ compelling influences or psychological ploys in tandem with police custody to obtain confessions.”); and State v Lockhart, 298 Conn 537, 590; 4 A3d 1176 (2010) (Falmer, J., concurring) (“[I]nterrogation methods used by the police ... often include sophisticated psychological ploys and techniques ....”), citing Garrett, The substance of false confessions, 62 Stan L Rev 1051, 1060 (2010).

 The majority argues that my interpretation of this psychological ploy is too attenuated to rise to the level of interrogation under Innis, see ante at 202-203; however, all psychological forms of interrogation rely on a human trait that is common to most people but not necessarily exhibited by all people. For example, Miranda, 384 US at 450, concluded that police tactics that “minimize the moral seriousness of the offense” or “cast blame on the victim or on society” are psychological ploys that may constitute interrogation practices depending on the circumstances. Surely, not all suspects would respond to such tactics, but the tactics nevertheless may constitute interrogation because they play to traits that are common to many, but not all, people. In my view, because concern for the safety of others is also a common human trait, the same is true of Stiles’s comment. And when the compelling influence of Stiles’s statement is combined with the custodial setting and other factors discussed throughout this opinion, I believe that defendant was subjected to the functional equivalent of questioning because the totality of the custodial circumstances caused defendant to make an incriminating statement “that would not [have been] given in an unrestrained environment.” Mauro, 481 US at 530.

 This aspect of Stiles’s statements illustrates another significant difference between this case and Innis. Because the officers in Innis were merely conversing amongst themselves regarding their concern about the whereabouts of the gun, the Innis defendant was not placed in a situation in which he merely needed to confirm the officers’ preconceived belief that he was guilty. Rather, as the Innis Court held, the officers’ comments *227 did not compel any response from the defendant. Conversely, in this case, not only could Stiles’s statement have been reasonably perceived by defendant as seeking a response given that the statement was expressly directed to him, the statement could also have exerted a compelling influence on defendant to merely confirm Stiles’s preconceived conclusion that defendant had committed the crime.

 Contrary to the majority’s interpretation of my opinion, this portion of my analysis does not conclude that defendant exhibited an “unusual” or “peculiar” susceptibility to a certain form of persuasion. As previously explained, like many psychological interrogation techniques that rely on a human trait that is common to most people, Stiles’s comments appealed to a common characteristic; concern for others. Rather than consider this possibility as part of a complete consideration of totality of the circumstances, the majority prefers to employ broad stereotypes, such as its belief that all suspects charged with homicide are cold-blooded killers. The majority’s approach is erroneous because, if this were true, Stiles would not have bothered to make the statement at issue. Indeed, if Stiles had no reason to “fathomQ” that defendant harbored any concern for the safety of others given that “defendant had just been arrested for shooting another man to death for drugs,” ante at 202-203, why would Stiles bother to make the statement? The majority fails to consider that, as defendant’s incriminating statement suggests, he made an extremely poor decision to perpetrate a robbery, but the shooting was not the intended result. A poor decision that led to a deadly, but unintended, result does not automatically sap defendant of his humanity. Thus, the majority’s analysis fails to consider the important factual intricacies of this case.