**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Doreen SMITH, Defendant-Appellant.**

**No. 84–1259.**

United States Court of Appeals, Tenth Circuit.

Nov. 6, 1985.

Presiliano A. Torrez (William L. Lutz, U.S. Atty., with him on brief), Asst. U.S. Atty., Albuquerque, N.M., for plaintiff-appellee.

Tova Indritz, Federal Public Defender, Albuquerque, N.M., for defendant-appellant.

Before BARRETT and McKAY, Circuit Judges, and CARRIGAN,* District Judge.

BARRETT, Circuit Judge.

Doreen Smith appeals her conviction following trial to a jury of involuntary manslaughter arising from a vehicular accident on the Navajo Indian Reservation near Gallup, New Mexico, on March 5, 1983. The accident occurred about 8:30 p.m.; it was a head-on collision between a Pontiac Trans-Am, driven by Smith, and a Honda 350 motorcycle. The motorcyclist, James Radloff, was killed. Smith and Francis Benally, another occupant of the car, were taken to a hospital in Shiprock, New Mexico. A third occupant of the car, Herman Tanner, apparently walked away from the accident scene and turned up in Farmington, New Mexico, the next morning.

Smith, Benally, and Tanner all live in Farmington. On March 5, they took a trip from Farmington west to Shiprock and then south to Gallup in Tanner's Pontiac Trans-Am. The trip began with Tanner driving the vehicle. Tanner and Benally were drinking beer during the trip, but Smith, tired from a late night, soon fell asleep in the back of the vehicle. They arrived in Gallup around 5:30 p.m., where the vehicle was stopped by the Gallup police. Tanner was given citations for having expired license plates and for driving without a license, although both he and Benally

---

* The Honorable Jim R. Carrigan, United States District Judge for the District of Colorado, sitting by designation.

passed field sobriety tests. Benally then took over the driving and the threesome left Gallup and headed north back toward Shiprock. Along the road Benally stopped the car for a "restroom stop." Since both Benally and Tanner had been drinking, Smith took over the driving. For some reason, she had turned the car around and was driving south, back toward Gallup, when the accident occurred.

The road at the accident scene is straight; there are no hills or obstructions in the vicinity. There is one lane in either direction and paved shoulders. R. Vol III at 474. The point of impact of the car and the motorcycle was approximately three and one-half feet from the shoulder line in the northbound (east) lane. The motorcycle's rear tire left a skid mark in the northbound lane before impact; the car's tires left no skid marks before impact, but all four tires left skid marks after impact leading into the southbound lane where the car came to rest.

The first Navajo police officer at the scene was Sam Ahkeah. He smelled a strong odor of liquor from the breath of both Smith and Benally. R.Vol. III at 389. Suspecting that they may have been intoxicated, Ahkeah brought the police department's "Intoxilyzer" machine to the hospital where Smith and Benally had been taken, and obtained breath samples from both of them. Benally tested at 0.17% blood alcohol content (BAC) at 9:46 p.m., Gov't. Exh. 33, and Smith tested at 0.16% BAC at 10:38 p.m., Gov't.Exh. 26.

Smith was indicted on June 29, 1983. The indictment charged that she had operated a motor vehicle in a "grossly negligent manner," with "knowledge of circumstances that made it reasonably foreseeable that her acts might imperil the lives of others." R.Vol. I at 1. Smith's first trial, at which she testified, ended in a hung jury; consequently a mistrial was declared. The second trial, at which Smith did not testify, ended in a guilty verdict and conviction.

The government's version and Smith's version of how the accident happened differ dramatically. The government's ver-

sion is that Smith was driving while intoxicated and was in the wrong lane because of negligence. Smith's version is that: she had not been intoxicated at all, having had only two beers that morning and nothing at all to drink since then; she had swerved into the wrong lane to avoid the motorcycle, which had been in her lane shortly before impact; and, the collision occurred because the motorcycle had quickly returned to its own lane.

On appeal, Smith challenges several of the court's evidentiary rulings during the second trial. Additional facts, as they become relevant, will be related in considering these challenges.

## I.

Smith contends that the court denied her due process right to a fair trial by denying her the opportunity to present her defense—her version of how the accident happened—when it refused to allow her attorney to question a witness during the second trial about a prior inconsistent statement he made at the first trial. The witness was John T. Hayes, a New Mexico state police officer and a traffic accident reconstruction specialist. At the first trial, Hayes concluded during cross-examination that, based on the physical evidence at the accident scene, the car must have been in the northbound (wrong) lane for a minimum of 131 feet before impact:

Q. [Defense counsel] Now, I want to turn your attention to the car, ... given what you understand is the road marks and skid marks and all that sort of thing, given the facts as you have previously interpreted them, as to the point of impact and the marks or lack of marks here.

How far away in feet, and then again in time, could it have been that this car was where it was at the the [sic] time of impact, and yet have been in its lane prior to that, given all the physical evidence that was at the scene, and given the size of the car and all these things, and assuming that the car was going 50 miles an hour?

MR. TORREZ [Prosecutor]: Is he to assume a certain speed for the motorcycle in her hypothetical?

THE COURT: I think she said 55.

MS. INDRITZ [Defense counsel]: I don't think this question even involves the the speed of the motorcycle. It involves the distance between the car being at the point of impact and the car being in its lane.

A. [Hayes]: Okay. There are two figures, and I will explain what they are. Had there been very hard steering, just beyond the point—or just below the point at which a mark would have been left, for the cars to come up in the fashion that they were, in order for the vehicle to recover and come back somewhat in a more straight position, would require about 131 feet.

BY MS. INDRITZ:

Q. And how does 131 feet translate into time at the rate of 50 miles an hour?

A. It would be 1.8 seconds.

Q. So, in other words, if Doreen was correct that she was in her lane and all the physical evidence is as you previously testified it was, including the point of impact and the marks and so on, she could have been in her lane here and then be here in the position of impact 1.8 seconds prior to the collision?

A. Yes, ma'am.

(First trial transcript, R. Supp. Vol. VIII at 551–53.)

The fact that Hayes's conclusion was based on the physical evidence as it actually existed was underscored a few minutes later on re-cross-examination:

BY MS. INDRITZ:

Q. Your testimony is that if the steering were below that degree of strength required to leave the yaw marks, right—

A. Yes, ma'am.

Q. —so, therefore, your testimony is based on the facts as you understand them to be, based on your evaluation of the evidence?

A. Based on the evaluation of the physical evidence.

Q. Based on the evaluation of all the physical evidence, she could have been in her lane 131 feet or 1.8 seconds prior to impact, where the impact occurred?

A. I believe so.

(First trial transcript, R.Supp.Vol. VIII at 555.)

Smith was thus able to establish at the first trial, through witness Hayes's testimony, that the car *must* have been in the wrong lane for a relatively short distance (131 feet) and time (1.8 seconds) before impact. The physical evidence gave no indication, one way or the other, about where the car may have been prior to 1.8 seconds before impact. Thus, as Smith stresses, it was *possible* that she was in the right lane prior to 1.8 seconds before impact. In other words, although Smith did not steer left into the oncoming lane hard enough to leave yaw (scuff) marks, she still could have steered left fairly quickly without leaving such marks. Thus, she claims, her version of the way the accident happened was not inconsistent with the physical evidence.

At the second trial, Hayes was again called to testify, this time as a defense witness. When defense counsel again asked for his conclusion as to the minimum distance and time that the car *must* have been in the wrong lane prior to impact, Hayes could not answer because he had not been given a speed for the car that he could base his calculations upon. (Hayes had assumed a speed of 50 m.p.h. in the first trial based upon Smith's testimony to that effect, but there had been no testimony yet as to the car's speed in the second trial.) The following exchange occurred between defense counsel and Hayes:

Q. Can you tell how far back the TransAm would had to cross the center line in order to be at the point of impact at the time of impact?

A. Again, not without having some type of a speed to deal with on the part of the TransAm.

\*　　\*　　\*　　\*　　\*　　\*

Q. But if you knew a speed you would be able to give us that information?

A. Yes, ma'am.

Q. And you would also be able to give us a time?

A. Yes, ma'am.

(R.Vol. III at 487–88.)

Later in the trial, the speed of the car and Smith's alleged evasive maneuver were established, R.Vol. III at 610–11, and Hayes was subsequently recalled. The physical evidence in the record was now, for all practical purposes, identical to the physical evidence upon which Hayes's conclusion at the first trial had been based. When defense counsel again asked for Hayes's conclusion, the court interrupted and asked the witness what facts he was basing his calculations on. R.Vol. III at 674–75. An exchange between the witness, defense counsel, the prosecutor, and the court followed, the result of which was that the witness testified that he could not make any conclusions without assuming the presence of yaw marks on the road prior to impact:

BY MS. INDRITZ:

Q. My question is, given the evidence that is there, given the evidence as you know it to be, can you tell us the minimum distance that this vehicle had to have been in this lane, the northbound lane, in order to be at the point of impact that you described the point of impact was?

MR. TORREZ: To which I would object.

THE COURT: Hold on a minute, before you make an objection. I thought that was just the question that I asked him. Mr. Witness, isn't that correct?

A. Yes, that I have to have the yaw marks, I have to have some marks here to indicate that and bring it up to that minimum.

THE COURT: Then on that basis, I will sustain the objection and he will not give that figure, or he cannot give that figure to the jury because he doesn't know what it would be.

MR. TORREZ: I would also like to point out that he is assuming that it is a driver that is operating and functioning normally.

THE COURT: I am taking all that into consideration when I refused to allow him to testify to that.

BY MS. INDRITZ:

Q. Now, I asked you the same question at the last trial in this case, didn't I?

A. Yes, ma'am, and I believe that our understanding was that it would again have to be with those marks.

MR. TORREZ: I would also like to point out to the jury that at the time that question was asked, he had heard—he had heard additional evidence.

THE COURT: Yes, and we are not going to go into that, counsel. That is a matter previous to this. This is a new jury.

(R.Vol. III at 678–79.)

Following this exchange, the jury left the courtroom and defense counsel made an offer of proof of Hayes's testimony at the first trial, with the request that she be allowed to impeach Hayes with his prior inconsistent statement. The court refused the request, apparently based on the ground that there was a lack of foundation:

MS. INDRITZ: The Court places me in a difficult position, but I think that it's important for me to get into the record what I asked him last time, because what I asked him last time assumed all the facts to be true.

THE COURT: What you asked him last time, you are not asking him to impeach him. You are just trying to get the facts, some additional facts into evidence.

MS. INDRITZ: No, your Honor, I am asking to impeach him. I am asking to impeach him because he now says that he can't answer a question when he answered the exact same question before, based on the exact same physical evidence.

THE COURT: And, counsel, I am trying to tell you that assuming the facts are the same, that we are not ever going to get to that point, because I am telling you that he cannot answer the question because these facts are not in evidence. Period.

(R.Vol. III at 687.)

The record does not clearly delineate the precise evidentiary issues that were in-

volved. For example, it is not clear whether defense counsel wished to make use of Hayes's prior inconsistent statement for impeachment purposes only, or whether she intended to use the prior inconsistent statement as substantive evidence to corroborate Smith's version of how the accident happened. Likewise, the court's decision to exclude Hayes's *prior* statement for all purposes apparently was based on the ground that there was no foundation in the *second trial* for Hayes to make such a statement. The rationale of the court's ruling seems incongruous; even assuming the court was correct that foundation was lacking, lack of foundation to state a conclusion the witness refused to state anyway simply has nothing to do with the question of whether use of the witness's prior inconsistent statement was proper in the context offered.

■ These mysteries need not, however, detain us. The witness's statement at the first trial (i.e., that he could conclude, based on the physical evidence as it existed, that the car had been in the wrong lane for a minimum of 131 feet prior to impact) was plainly inconsistent on its face with the statement he made in the second trial (i.e., that he could make no conclusion, based on the physical evidence as it existed, about the car's position prior to impact). There was no reason, assuming the proper procedures had been followed, why defense counsel should not have been able to question the witness about his prior inconsistent statement in an attempt to impeach him. *See* Fed.R.Evid. 613; *United States v. Sisto,* 534 F.2d 616, 622–23 (5th Cir.1976). Furthermore, because the prior inconsistent statement was originally given under oath and the witness was subject to cross-examination concerning the statement, the prior inconsistent statement itself was admissible as substantive evidence under Fed.R.Evid. 801(d)(1)(A). *United States v. Silverstein,* 737 F.2d 864, 867 (10th Cir.1984); *United States v. Plum,* 558 F.2d 568, 575 (10th Cir.1977). Therefore, the trial court erred in refusing to allow inquiry about Hayes's prior testimony, whatever purpose such inquiry may have been directed to-

ward. Any foundation problems that may have been relevant for the purpose of explaining the apparent inconsistency between Hayes's two positions would presumably have been brought to the jury's attention through further questioning of Hayes by the government or even by the court.

■ Although we hold that the court erred in refusing to allow defense counsel to question Hayes about his prior inconsistent statements, we are convinced from our review of the record that the error was harmless. While the prior testimony might have worked to impeach Hayes, we have not read anything in Hayes's testimony at the second trial that was damaging to Smith. Hayes had been called as a defense witness. His testimony consisted primarily of a description of the accident scene which corroborated a description already given by another police officer, Evan Lee, and which was no different from Hayes's testimony at the first trial. There was nothing in Hayes's testimony in the second trial that harmed Smith's case; thus, it was not important for Smith's defense that Hayes be impeached. The only real value of Hayes's prior testimony, then, would have been as substantive evidence. Hayes's scientific conclusions could have been presented to the jury even though Hayes would not repeat them. Even this would have been of limited value for Smith, however. As mentioned earlier, Hayes's conclusion that the car must have been in the wrong lane for 131 feet before impact gave no indication, one way or the other, about where the car might have been prior to 131 feet before impact; the car could have been in either lane. Hayes's conclusion, in fact, was harmful to Smith to the extent that it showed that she had definitely not swerved hard enough to cause yaw marks before impact. Furthermore, a review of the case that Smith's counsel presented (i.e., the content of the opening and closing statements and the content of the defense witnesses' testimony) shows that the focus was on the question whether Smith was intoxicated. Inasmuch as Smith did not testify, the only evidence that Smith had

swerved to the left to avoid the collision was the testimony of FBI Agent Felter, to whom Smith had spoken after the accident. R.Vol. III at 610–11. Hayes's prior testimony, had it been admitted for substantive purposes, would neither have corroborated nor refuted the idea that Smith had swerved to the left in order to avoid the oncoming motorcycle. The exclusion of that testimony was, at most, harmless error.

## II.

Smith contends that the court abused its discretion in admitting evidence of the "Intoxilyzer" breath test results. Smith claims the test results were unreliable because (1) the machine had not been calibrated in approximately two months, (2) the machine had been moved and jostled on the way from police headquarters to the hospital, and (3) no breath sample was saved for later retesting, and therefore the results had little probative value and should not have been admitted.

■ This is essentially a claim that the court abused the broad discretion it has under Fed.R.Evid. 403 to exclude evidence whose prejudicial effect outweighs its probative value. *United States v. Martinez,* 744 F.2d 76, 80 (10th Cir.1984). We hold that the court did not abuse its discretion in admitting the test results. The technique of testing breath samples for blood alcohol content has general acceptance in the scientific community, and thus meets the classic test for admissibility of scientific evidence that was given in *Frye v. United States,* 293 Fed. 1013, 1014 (D.C.Cir.1923). The reasons given by Smith why the results may have been unreliable went to the weight of the evidence, not to its admissibility. Smith's counsel had the opportunity to explore the consequences of any defects that may have occurred in the testing procedures and did so, particularly with witness John Zettl.

■ Smith makes a similar Rule 403 argument in claiming that the court abused its discretion in admitting three photographs of the car and of the victim lying in the roadway, particularly since she had already formally admitted that the victim died as a result of injuries sustained in the accident. R.Vol. I at 203. Again, we see no reason to disturb the exercise of the court's discretion in this matter. The court examined the four photographs objected to (Gov't.Exh. # 2, 3, 4, 5) and excluded two of them. R.Vol. II at 272–73. The other two were admitted because of their probative value in depicting the accident scene, including paint markers used as reference points. The photograph of the car (Gov't. Exh. 22) was admitted because of its probative value as to point of impact. R.Vol. II at 257–260.

Smith has made a number of other contentions that the court erred in admitting evidence that was irrelevant or that probative value was outweighed by prejudicial effect. We have considered each of them and hold that they are without merit. The trial court acted within its discretion in each instance.

## III.

■ Smith claims that a statement she made to Edward Boggio, a criminal investigator for the Bureau of Indian Affairs concerning how the accident happened should have been suppressed because she was not given her *Miranda* rights before she made the statement. The record, however, shows that Smith had, in fact, been given her *Miranda* rights, although not by Boggio. R.Vol. III at 440, 449. Furthermore, the statement she made to Boggio was spontaneous; it was not a result of any questions or interrogation by Boggio. R.Vol. III at 457. See *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). Under the circumstances, we hold that there was no violation of the rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## IV.

Smith has made a number of other allegations of error. These include (1) allow-

ing the scope of direct examination of witness Felter to be exceeded on cross-examination, (2) prosecutorial misconduct in the form of improper comment on the defendant's failure to testify, (3) failure to rule on a motion in limine concerning Smith's prior misdemeanor conviction, (4) abuse of discretion in conducting the voir dire of potential jurors, (5) improper use of judicial notice. We have considered each of these allegations and find them to be uniformly without merit. Smith presented this court with over a dozen separate allegations of error. We observe that the sheer quantity of allegations does not, in itself, lend validity to each individual allegation. Furthermore, we find no indication of cumulative error in the record. This is not a case where a number of errors occurred, all of which were harmless in themselves, but with cumulative prejudicial effect. Rather, we have sifted through these allegations of error and hold that the court did *not* err in its rulings, with but one exception. That exception, as we have noted, was harmless because the focus of the defendant's case was elsewhere.

WE AFFIRM.

McKAY, Circuit Judge, dissenting:

Defendant appeals her conviction for involuntary manslaughter on the ground that she was denied a fair trial in the district court.

On March 5, 1983, a passenger car driven by defendant Doreen Smith collided with a motorcycle driven by Mr. John Radloff, who died as a result of injuries sustained in the accident. In defendant's first trial the jury was unable to reach a decision and the court declared a mistrial. In her second trial the jury found defendant guilty.

The government claims that defendant was intoxicated and was negligently driving on the motorcyclist's side of the road at the time of the accident. Defendant claims that she was not intoxicated and had steered into the on-coming lane in order to avoid collision with the motorcycle, which appeared to be veering sharply into her lane just prior to impact. On appeal, de-fendant challenges several of the court's evidentiary rulings during the second trial. Because I believe that the cumulative effect of the court's erroneous rulings was to deny defendant a fair trial, I must dissent.

In the first trial the government called officer John Hayes, a traffic accident reconstruction specialist for the New Mexico State Police. Mr. Hayes testified that, based upon his examination of the accident scene and upon another officer's measurements of the marks and debris on the road, he could only conclude that the motorcycle "would have to have been probably within its lane for probably 50 to 60 feet prior to impact." Record, supp. vol. 8, at 549. He further testified that at the rate of 55 miles per hour, the speed limit on that road, the motorcycle would have traveled the distance of 50 to 60 feet in approximately six-tenths of one second. Record, supp. vol. 8, at 549. At the first trial defendant used this testimony to argue that if the motorcyclist was traveling at 55 miles per hour, it is possible that seven-tenths of one second before the accident he could have been in the defendant's lane.

Similarly, Mr. Hayes testified at the first trial that, given the marks on the road, it is possible that as close as 131 feet from the point of impact defendant's vehicle could have been in its proper lane. Record, supp. vol. 8, at 552. He further testified that at the rate of 50 miles per hour, 131 feet would translate into 1.8 seconds. Defendant used this testimony at the first trial to argue that defendant's vehicle could have been in its proper lane 1.8 seconds prior to the collision.

In the second trial defendant called Mr. Hayes as a witness. He again testified that at a minimum the motorcycle was in its proper lane for 50 to 60 feet prior to impact. The court refused to allow Mr. Hayes to testify as to the distance the motorcycle would have traveled in that 50- to 60-foot distance, however, either at 55 miles per hour or at any lesser speed. Record, vol. 3, at 479. Mr. Hayes was also again asked at what minimum distance prior to the accident defendant's vehicle could

have been in its proper lane, but testified that he could not make that judgment. Defense counsel attempted to impeach Mr. Hayes by showing that he had made such an estimate, based on identical physical evidence, at the first trial. The court refused to allow impeachment, however. Record, vol. 3, at 678–80.

I agree with the majority that the court erred in refusing to allow defense counsel to question Mr. Hayes about his prior inconsistent statements. As the majority notes, the same physical evidence available to Mr. Hayes at the first trial was available to him at the second trial, and his two statements were plainly inconsistent. Thus, defense counsel should have been allowed to question Mr. Hayes about his prior inconsistent statement in order to im-. peach him. *See* Fed.R.Evid. 613; *United States v. Sisto*, 534 F.2d 616, 622–23 (5th Cir.1976). Furthermore, as the majority points out, "because the prior inconsistent statement was originally given under oath and the witness was subject to cross-examination concerning the statement, the prior inconsistent statement itself was admissible as substantive evidence under Fed.R. Evid. 801(d)(1)(A)." Maj.Op. at 897 (citing *United States v. Plum*, 558 F.2d 568, 575 (10th Cir.1977)).

I cannot agree with the majority, however, that this error was harmless. It is true, as the majority notes, that Mr. Hayes' "conclusion that the car must have been in the wrong lane for 131 feet before impact gave no indication, one way or the other, about where the car might have been prior to 131 feet before impact; the car could have been in either lane." Maj.Op. at 897. But this misconceives the legitimate objective defendant sought to achieve with this evidence. The defendant merely sought to use the evidence to show that, as a theoretical possibility, the accident could have happened as she claimed it did. Thus, the testimony was important to the presentation of her defense and its exclusion was not harmless.

I might, nevertheless, be somewhat hesitant to overturn the district court's judgment if this were the only error committed in the trial. My review of the transcript convinces me, however, that the cumulative effect of this and other errors by the district court had the effect of denying the defendant a fair trial. Two other errors with which I am particularly concerned are the court's refusal to preclude the admission of several photographs, which were inflammatory and had no relevance to any of the issues in the case, and the court's refusal to sustain defendant's objection to testimony by the defendant's father, which was similarly irrelevant.

The following admission was read to the jury prior to the taking of any testimony in the case:

The defendant, Doreen Smith, admits as follows:

John Radloff, the motorcyclist, died at the scene of the accident which is the subject of this case as a result of injuries sustained in that accident; the results of a blood test for alcohol content were negative.

Record, vol. 2, at 153. Based on this admission, the defendant sought to exclude photographs of Mr. Radloff lying on the roadway at the scene of the accident. These photographs showed an injured Mr. Radloff lying on the roadway, bleeding profusely from the groin and also bleeding from the mouth. Record, vol. 4, Government's Exhibits 2 and 3. Further, defendant sought to exclude Government's Exhibit 22, a photograph of the automobile that showed bits of blood and flesh and also purported to have yellow marks that the government witness said he believed were pieces of the victim's yellow raincoat. The defendant sought to exclude these items on the basis that the admission covered the proximate cause of death, and therefore any further discussion or showing of the nature of the injuries served only to inflame the jury and was not probative as to any of the issues in the case. Record, vol. 2, at 263–68.

The point of impact on the defendant's car was certainly relevant to defendant's evasive driving defense. Indeed, defend-

ant did not object to the admission of numerous pictures showing the condition of the damaged automobile after the accident. Record, vol. 2, at 257; Government's Exhibits 17 to 21. Exhibit 22, however, differed from these pictures in that it depicted a perspective too close to the damaged automobile to discern the relative point of impact and, regardless, was certainly cumulative to the other, more instructive photographs of the car. Exhibit 22 was excluded by the court at the first trial on the grounds that it did not go to the defendant's evasive driving action defense, and in the court's words:

I do believe with those markings of flesh on there that that is a little bit out of hand. I think that would tend to—these two photographs right here show the same thing. All he testified was that that was a closer up view of this one right here.

. . . .

But I do believe on the basis of this, that flesh ... I am not going to allow 22 in at this time.

Record, supp. vol. 6, at 132. At the second trial, however, the court decided to allow the same exhibit into evidence, provided the prosecutor instruct his witness not to talk about the pieces of flesh and blood on the hood. The defense counsel objected, stating:

We would ask the Court to note that it does show the flesh, and when it is shown to the jury—they say a picture is worth a thousand words. I think if the officer doesn't testify to that, it is going to be obvious to the jury what it is.

Record, vol. 2, at 260.

To this the court replied:

It's not obvious to me, counsel, that that's what it is. I don't know what it is. It could be pigeon droppings as far as I know, so we are going to let it come in for what it's worth.

Record, vol. 2, at 260. After reviewing the photographs in question, it is my view that photographs 2, 3, and 22 were cumulative, were not probative of the issues before the court, and were inflammatory.

The defense also sought to have the testimony of Mr. James Radloff, father of the victim, excluded. The senior Mr. Radloff was not present in New Mexico at the time of the accident and had had no contact with his son for many days prior. Mr. Radloff testified that he was married 18 years and named his children. He explained that his son, John, had left home on his (John's) birthday with a female friend to take a job in Mapleton, Utah. Record, vol. 2, at 153–56. He also gave details of how and by whom he was told his son had been "killed," identified photos of the motorcycle and his son's driver's license, and listed the personal items that had been returned to him. Record, vol. 2, at 156–58.

I can conceive of no reason, given defendant's stipulation as to the victim's identity, for allowing the testimony of Mr. Radloff. His testimony was not probative of any of the issues in the case. Certainly, it could have been more inflammatory than it was. Still, it may very well have achieved the government's only apparent purpose—eliciting sympathy toward the victim and his family and engendering antipathy toward the defendant. Again, standing alone, the allowance of this testimony might not merit overturning the trial court's decision. When this error is combined with the other errors I have explicated, however, I must conclude that defendant has been denied a fair trial.

Finally, there is a further problem with this case. The court's about-face in the second trial on certain evidentiary rulings it had made in the first trial creates the appearance, whether accurate or not, that the court departed from its role as neutral judge and gave undue advantage to the prosecution. Of course, regardless of the appearance, judges have the duty to correct those errors of which added experience with a case makes them aware. An appearance of unfairness, however, even if unfounded in fact, is relevant to the question of prejudice.

It is indeed tragic that anyone should die as Mr. Radloff did. Further, it is vital that those who drive in such a way as to endan-

ger the lives of innocent persons be brought to justice. Justice includes a full and fair opportunity for a defendant to present his or her defense, however, and I cannot conclude that defendant was afforded such an opportunity in this case. I would hold that the cumulative effect of the district court's errors was to deny the defendant a fair trial, and remand for a new trial.