**UNITED STATES of America, Plaintiff,**

v.

**Michelle SINGLETON, Defendant.**

No. 95–40076–01–SAC.

United States District Court,
D. Kansas.

March 28, 1996.

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, Michelle Singleton, Lawrence, KS, for defendant.

Thomas G. Luedke, Office of United States Attorney, Topeka, KS, for plaintiff.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant Michelle Singleton's motion to suppress evidence (Dk. 16), motion to suppress statement (Dk. 17), and motion for Rule 404(b) disclosure (Dk. 18). The government filed a written response in opposition. (Dk. 19). The court heard argument and evidence on these motions on February 21, 1996. After reviewing the parties' briefs and the controlling law, the court is ready to rule.

### INDICTMENT

The indictment filed November 1, 1995, charges Michelle Singleton with nine counts. Count one charges that between July 16, 1995, and July 25, 1995, she aided and abetted the transporting of goods taken by fraud, specifically a 1990 Bayliner boat, in interstate commerce in violation of 18 U.S.C. §§ 2314 and 2. Count two charges that on August 30, 1995, she knowingly possessed stolen goods, a 1990 Bayliner boat, which had been taken by fraud from Nebraska to Kansas in violation of 18 U.S.C. §§ 2315 and 2.

Count three charges that on August 30, 1995, she knowingly possessed counterfeited payroll checks purportedly drawn on thirty-four different organizations and businesses in violation of 18 U.S.C. §§ 513(a) and 2. Count four charges that on August 30, 1995, she knowingly aided and abetted in the possession of five identification documents with the intent to use them unlawfully so as to affect interstate commerce in violation of 18 U.S.C. §§ 1028(a)(3) and 2. Count five charges that from July 1, 1995, continuing through August 31, 1995, she conspired with Charles Mark Degaetani and others to unlawfully possess, make or utter counterfeit

payroll checks on various corporations with the intent to deceive other persons or organizations and in furtherance committed overt acts as charged therein, all in violation of 18 U.S.C. §§ 371 and 513. Count six charges that on August 30, 1995, she knowingly possessed or aided and abetted the possession with the intent to distribute in excess of one pound of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D), and 18 U.S.C. § 2. Count seven charges that on August 30, 1995, she knowingly used a firearm during and in relation to a drug trafficking crime (Count 6) in violation of 18 U.S.C. §§ 924(c) and 2. Count eight charges that on August 30, 1995, she conspired with Charles Mark Degaetani and others to possess in excess of one pound marijuana with the intent to distribute it in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D). Finally, count nine charges that on August 30, 1995, she knowingly used a firearm during and in relation to a drug trafficking crime (count 8) in violation of 18 U.S.C. §§ 924(c) and 2.

In sum, Singleton is charged with one count (No. 1) of having aided and abetted the transportation of goods obtained by fraud in interstate commerce in violation of 18 U.S.C. §§ 2315 and 2, one count (No. 2) of possessing stolen goods in violation of 18 U.S.C. §§ 2315 and 2, one count (No. 3) of possessing counterfeit securities in violation of 18 U.S.C. § 513(a) and 2, one count (No. 4) of aiding and abetting the possession of more than five identification documents in violation of 18 U.S.C. §§ 1028(a)(3) and 2, one count (No. 5) of conspiracy to possess, make or utter counterfeit payroll checks in violation of 18 U.S.C. §§ 371 and 513, one count (No. 6) of possession with the intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2, one count (No. 8) of conspiracy to possess with the intent to distribute marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D), and two counts (Nos. 7 & 9) of using a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. §§ 924(c) and 2.

# FACTS

Shortly after 3:00 p.m. on August 30, 1995, Topeka Police Department officers were called to the Hampton Inn in West Topeka. The manager at the Hampton Inn, John Scott, told the arriving officers that the tenants in room 131 were to vacate their room at 11:00 a.m. but had not done so and that the tenants now owed additional rent.

Scott testified that a person identifying himself as Mark Carlucci first checked into the Hampton Inn on the evening of August 28, 1995, and paid cash to stay one night. At around 12:30 p.m. the following day, Carlucci paid to stay another night. Scott contacted Carlucci's room the next morning on August 30, 1995, to ask if he intended to stay longer. Scott learned that Carlucci and his guest would be staying and that Carlucci would come to the office shortly to pay the rent for another night. Scott called Carlucci's room three more times before 1:00 p.m. inquiring when Carlucci would be paying the rent. Scott was told that they were waiting for Carlucci's employer to come by with a check so that they could pay to stay another night. Scott informed Carlucci that the Hampton Inn charged all customers staying past 2:00 p.m. for one-half day. Scott again called Carlucci's room around 2:00 p.m., and Carlucci repeated his plea for Scott to be patient. Anticipating a problem because Carlucci now owed the Inn rent for one-half day, Scott called the Topeka Police Department around 3:00 p.m. requesting an officer.

Sergeant Maurice Koch with the Topeka Police Department was the first to arrive at the Hampton Inn. Koch learned that the tenants in room 131 owed rent and that the Inn's management wanted the tenants either to pay the rent for another night or vacate their room. Sergeant Koch then drove around to the rear of the Inn and saw that the tenants' car was still parked in front of their room. As he ran a license plate check on the car, two males and a female emerged from room 131. One of the males identified himself as Mark Carlucci. Carlucci was later identified as Charles Mark Degaetani.[1] The

---

1. For the remaining part of this order, the court will refer to the defendant by his name, Charles

M. Degaetani.

others were identified at the time as Scott Rose and Michelle Singleton. Degaetani told Sergeant Koch that he was going to speak with the manager about the bill. Other officers arrived at the scene and remained in the area of room 131 while Koch returned to the manager's office where he was met by Degaetani.

Degaetani was upset with Scott for calling the police. He told Scott that he had not yet received the funds necessary to pay the full rent for another night. Scott insisted that Degaetani's time was up and that he needed to pay for one-half day and leave the room. Scott gave Degaetani fifteen minutes to get the money, pack his belongings, and vacate the room. After waiting the allotted time and making a phone call to room 131 that was not answered, Scott told Sergeant Koch that he no longer cared about the one-half day rent and that he wanted the officers to evict the persons from room 131.

Scott sent a maintenance employee with a pass key to accompany Sergeant Koch to room 131. Sergeant Koch knocked a couple of times on the door to room 131 and announced himself and instructed the tenants that they were to vacate the room. Sergeant Koch heard motion in the room, but no one came to the door. When Sergeant Koch announced that management was preparing to enter the room with a pass key, Rose or Degaetani finally opened the door and Sergeant Koch stepped inside the room for the purpose of evicting them. This was the first time that the officers had entered room 131 that afternoon. Degaetani explained to Koch that he had not answered the door as he had been on the phone with his attorney.

While telling them to vacate the room, Sergeant Koch observed that the tenants had not made much effort to pack their belongings as many things were still laying about the room. Koch asked where the female occupant was, and Rose and Degaetani said that she was in the bathroom. Koch heard the bathroom stool flush several times. He then noticed water flowing from beneath the

bathroom door and floating on the water was a green vegetation that appeared to be marijuana. Koch also noticed what appeared to be a baggie of marijuana laying in plain view on one of the beds.

Ms. Singleton did not open the bathroom door though she was asked several times to do so. She told officers that she could not open the door as the inside door handle had come off. She continued to flush the stool six or seven times. Receiving permission from the Hampton Inn's staff, the officers forced open the bathroom door and found Ms. Singleton with a plastic bag containing what appeared to be marijuana. At that point, Singleton, Degaetani and Rose were arrested.

The officers called in a drug dog which alerted to a bag. The officers found marijuana in the bag. In plain view, officers also saw check writing equipment and blank checks. The search incident to the arrest of the two defendants yielded false identification, a laminating machine, numerous counterfeit checks, check writing equipment, and two firearms. The officers inventoried the room and took all property to the station for safekeeping. Items of evidentiary value were kept in police custody.

The officers transported the defendants to the police station for booking and interviewing. Detective Mills testified to the following facts. Around 6:00 p.m. on August 30, 1995, Singleton was brought into the police department's interview room. She was not wearing handcuffs. Mills identified himself and showed Singleton his identification and badge. He then requested basic information like Singleton's name and the spelling of her name. Mills next announced that he wanted to talk with her about the incident at the Hampton Inn. Mills then purposely sat quiet.[2] Mills testified on cross examination that he paused a couple of minutes, and on redirect examination Mills testified that he paused only seconds. During the pause, however long it was, Singleton responded by talking for several minutes. Mills did not

2. On redirect examination, the court recalls that Mills testified in relevant part:
 "Then I explained to her I wanted to talk to her about the incident out at the hotel. Then I

sat quiet and she made a couple of statements to me then she stopped talking, so at that point, I read her her rights in the hopes that we could continue the conversation on."

testify to what Singleton actually said during this period, other than to opine that her statements were incriminating.

When Singleton stopped talking, Mills read the *Miranda* warning to her for the first time. He read it through once, and he then repeated it stopping after each sentence and having her verbally acknowledge that she understood it. Singleton indicated that she understood her rights and waived them. Mills did not present a written waiver form for her to sign. Mills described Singleton's demeanor as a little worried and nervous but not overly emotional or hysterical. Mills observed that Singleton answered his questions appropriately and that the conversation proceeded without any problems. Mills estimated that the actual interview lasted only thirty minutes. During the interview, Singleton never invoked her rights and never appeared reluctant to talk. The interview was not recorded on video or audio equipment. Mills said he took simultaneous notes of the interview, but he did not have them in the case file at the time of the hearing. At some point during the interview, Mills told Singleton that Degaetani was telling the police everything, when Mills had no idea whether Degaetani had provided or would provide any such information.

## MOTION TO SUPPRESS (Singleton Dk. 16).

Singleton seeks to suppress all evidence seized during the search of room 131 at the Hampton Inn on August 30, 1995. She also seeks to suppress all evidence seized from the vehicles parked at the Hampton Inn and the recreational vehicle kept at Lake Perry.

■ The Tenth Circuit in *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir.1994), recently said that a defendant has the "burden of proving whether and when the Fourth Amendment was implicated" at the point the defendant or the evidence was seized. More specifically, the defendant must prove her standing to challenge the search[3] as well as a prima facie case of a Fourth Amendment violation. *Id.* at 1496 n. 1; *see United States*

*v. Poulsen*, 41 F.3d 1330, 1335 (9th Cir.1994) (the defendant has the burden of establishing her standing to assert a Fourth Amendment violation). "The government then bears the burden of proving that its warrantless actions were justified" under the facts and law. *Carhee*, 27 F.3d at 1496.

■ The protection from unreasonable searches and seizures afforded by the Fourth Amendment reaches only places and interests in which the defendant has a reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 140–45, 99 S.Ct. 421, 428–32, 58 L.Ed.2d 387 (1978). The defendant must prove that she has a subjective expectation of privacy and that her expectation is objectively reasonable under the circumstances. *United States v. Singleton*, 987 F.2d 1444, 1447–50 (10th Cir.1993). "[T]he demonstration of a legitimate expectation of privacy 'is a threshold standing requirement, and analysis cannot proceed further without its establishment.'" *Id.* at 1449 (quoting *United States v. Cruz Jimenez*, 894 F.2d 1, 5 (1st Cir.1990)).

■ Not unlike a home, hotel rooms occupied like a temporary abode receive the Fourth Amendment's protection. *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *United States v. Foxworth*, 8 F.3d 540, 544 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994); *United States v. Richard*, 994 F.2d 244, 247 (5th Cir.1993); *United States v. Parizo*, 514 F.2d 52, 54 (2nd Cir.1975); *United States v. Croft*, 429 F.2d 884, 887 (10th Cir.1970). The right to that protection in a hotel room depends "on the right to private occupancy of the room." *United States v. Croft*, 429 F.2d at 887. The well-established rule is that a guest in a motel room loses any reasonable expectation of privacy in the room and, therefore, any standing to object to a seizure or search of the room upon the expiration of the rental period. *United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir.1992);

---

3. As reflected on defendant Degaetani's exhibit D–1, Degaetani had registered room 131 in his name with two adult occupants. Exhibit D–1 does not identify the other adult staying in room

131. Scott testified that on August 30, 1995, he identified the other adult staying in room 131 as Singleton.

*United States v. Rahme,* 813 F.2d 31, 34 (2nd Cir.1987); *United States v. Ramirez,* 810 F.2d 1338, 1341 (5th Cir.), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987); *United States v. Croft,* 429 F.2d at 887. As the Tenth Circuit in *Croft* said:

> When the rental period has elapsed, the guest has completely lost his right to use the room and any privacy associated with it. The manager of the motel may then freely enter the room, rent the room to others, and remove any belongings left in the room. These belongings may be retained and eventually sold by the motel to pay for back rent. (footnote omitted). Since after the rental period expires a guest has no right of privacy, there can be no invasion thereof. (citation omitted).

429 F.2d at 887 (citing in footnote K.S.A. §§ 36–201 to 36–205); *see United States v. Lee,* 700 F.2d 424, 425 (10th Cir.), *cert. denied,* 462 U.S. 1122, 103 S.Ct. 3094, 77 L.Ed.2d 1353 (1983). In short, once the rental period expires, control over the room reverts to the motel manager, and the former tenant no longer can reasonably assert an expectation of privacy in a place from which he is being evicted. *See United States v. Rambo,* 789 F.2d 1289, 1295–96 (8th Cir. 1986).

■ Even if the holdover tenant may have a property interest in items still found in the room, the tenant does not have a reasonable expectation of privacy in the room after the rental period terminates. The Second Circuit has said:

> This rule applies even when the accused retains significant property interests in the seized item or place. For example, we have held that once the guest's access to the room is no longer his 'exclusive right,' he has no legitimate expectation of privacy in the room even though he himself still has access. *United States v. Parizo,* 514 F.2d at 55; *cf. United States v. Rambo,* 789 F.2d at 1295–96 (rule applied when rental period had expired even though defendant remained in possession of the room).

*United States v. Rahme,* 813 F.2d at 34.

■ "Warrantless searches and seizures inside someone's home are presumptively un-reasonable unless the occupants consent or exigent circumstances exist to justify the intrusion." *United States v. Richard,* 994 F.2d at 247 (citing *Payton v. New York,* 445 U.S. 573, 586, 590, 100 S.Ct. 1371, 1380, 1382, 63 L.Ed.2d 639 (1980)). When the occupancy period elapses without the tenant's payment for the next day's rent, the hotel management regains control of the room and may give consent to have the room searched. *United States v. Rambo,* 789 F.2d at 1296 n. 7; *United States v. Parizo,* 514 F.2d at 54. "Federal courts of appeals have uniformly approved warrantless searches of hotel or motel rooms after occupancy has terminated." *United States v. Ramirez,* 810 F.2d at 1341 n. 3 (and cases cited therein); *see also United States v. Poulsen,* 41 F.3d at 1336–37.

■ By the express terms of the agreement with Hampton Inn, Degaetani's cash payment on August 29, 1995, lawfully entitled him and Singleton to exclusive possession of room 131 until August 30, 1995, at 11:00 a.m. In short, their lawful occupancy of room 131 expired at 11:00 a.m. and whatever expectation of privacy they could claim in that room depends on circumstances other than the express terms of Degaetani's prior agreement with Hampton Inn.

At the hearing, defense counsel argued that Singleton had a reasonable expectation of privacy in the room based on Degaetani's mutual understanding with Scott. Specifically, Singleton argues that Scott first extended the time to pay for continued occupancy and then when Degaetani failed to come up with the money to pay the rent Scott allowed him a brief period to pack their belongings and vacate the room. Singleton argues that the police entered their room before the time had expired for them to pack their bags and vacate.

Courts have recognized instances where a tenant's subjective expectation of privacy reasonably continued past the technical expiration of the lease. In *United States v. Owens,* 782 F.2d 146, 150 (10th Cir.1986), the Tenth Circuit found that the defendant renting a motel room reasonably expected that he had rented the room for the entire week because he had deposited funds equal to the

weekly rate. Even if he was not a weekly tenant, the court found that his reasonable expectation of privacy continued past the noon check-out time, as several days before the motel had inquired of his plans and had allowed him to pay the rent at 3:00 p.m. *Id.* In *United States v. Watson,* 783 F.Supp. 258 (E.D.Va.1992), the hotel had been lax in enforcing its check-out policy and had allowed the defendant on four prior days to stay past the noon check-out time and to pay the next day's rent either in the late afternoon or evening.

The facts here do not resemble *Owens* or *Watson* and do not show that Singleton had a reasonable expectation of privacy in room 131 when the officers entered it. Having failed to pay the rent for another night within the time given by Scott, Singleton could not have had a legitimate expectation of privacy in the room simply because she and Degaetani remained in possession of it. It is uncontroverted that Scott openly treated Degaetani and Singleton as holdover tenants. When Degaetani did not timely return to the manager's office with the additional rent as promised, Scott directed the police officers to evict the occupants from room 131. Both Scott and Sergeant Koch testified that the time allotted for the occupants to vacate the room had expired when Koch knocked on the door to evict them. Whatever claim of privacy that Singleton could have based on Scott giving Degaetani time to vacate the room need not be resolved, for the allotted time had lapsed before the officers ever entered room 131. Sergeant Koch understood that Scott had authorized him to enter room 131 in order to evict the tenants. Scott plainly intended for the police officers to enter the room for that purpose, as he had sent a maintenance person with a pass key along with the officers. When Sergeant Koch lawfully stepped into room 131, he observed

marijuana in plain view thus providing him with probable cause to arrest the defendants and to search them and the immediate area incident to their arrests.[4]

## MOTION TO SUPPRESS STATEMENT (Dk. 17).

Singleton seeks to suppress her statements made to law enforcement officers after her arrest on August 30, 1995. Singleton alleges she made incriminating statements prior to being read her *Miranda* rights. She argues the statements should be suppressed: first, as fruit of the illegal search of their motel room; second, as a *Miranda* violation; and third, as an involuntary statement. Having concluded that the search of the motel room was not unlawful, the court summarily rejects the first ground for suppression of the statement.

█ In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Statements made not as a result of questions or interrogation, but spontaneously, are admissible even in the absence of any Miranda warnings. *U.S. v. Smith,* 776 F.2d 892, 898 (10th Cir.1985); *U.S. v. Muniz,* 1 F.3d 1018, 1022 (10th Cir.) ("If a person voluntarily speaks without interrogation by an officer, the Fifth Amendment's protection is not at issue, and the statements are admissible." (citation omitted)), *cert. denied,* —— U.S. ——, 114 S.Ct. 575, 126 L.Ed.2d 474 (1993).

"[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *Unit-*

---

**4.** The defendant Singleton does not advance any specific arguments challenging the subsequent search of her bags. The court believes the search and seizure of the bags were proper as a search incident to arrest. Even if the court were to find that the search of the bags was not a lawful search incident to arrest, the evidence would not be suppressed, as it would have been inevitably discovered during the inventory search of the properly seized items.

The government announced at the close of the hearing that it does not intend to introduce any evidence from the search of the two vehicles. In light of this representation, the court denies the defendant's motion to suppress any evidence seized from the cars as moot. This ruling is without prejudice to the defendant's right to renew this motion in the event that the government later decides to introduce this evidence.

ed States v. Perdue, 8 F.3d 1455, 1463 (10th Cir.1993); see also United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir.1994). There is no dispute that Singleton was in custody when she was taken into the interview room at the police station to speak with Detective Mills.

The second element, interrogation, "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). Thus, interrogation includes "a practice that the police should know is reasonably likely to evoke an incriminating response." Rhode Island v. Innis, 446 U.S. at 301, 100 S.Ct. at 1690. The test for functional equivalence of interrogation turns not on the subjective intent of the law enforcement officer, though it is a relevant factor, but on the objective assessment that a reasonable person in the suspect's position would perceive the officer's statements and actions as interrogation. United States v. Taylor, 985 F.2d 3, 7 (1st Cir.), cert. denied, 508 U.S. 944, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993); see United States v. Moreno–Flores, 33 F.3d 1164, 1169 (9th Cir.1994).

The court finds that Detective Mills' statement and conduct were the functional equivalent of interrogation. Singleton was brought to the interview room at the police station. She and Detective Mills were the only persons in the room. Detective Mills identified himself and showed his badge to Singleton. He first asked her several brief biographical questions, none of which apparently elicited an incriminating response. At this point, a law enforcement officer should appreciate the reasonable likelihood that a suspect would perceive she was there to be interrogated. Rather than giving the Miranda warning, Detective Mills next stated that he wanted to talk about the incident at the hotel. He did not say anything else but sat quietly. Detective Mills' statement refers to the very matters for which Singleton was under arrest. There is a reasonable likelihood that a suspect in Singleton's position would have interpreted Detective Mills' pause as transforming his statement into an implicit interrogatory. At the very least, Detective Mills' pause either implied an expectation that some response would be made or amounted to an uncomfortable silence that the suspect would likely break. Under these circumstances, a law enforcement officer should appreciate the reasonable likelihood that such a statement followed by a deliberate and lengthy pause will elicit an incriminating response. The failure to advise Singleton of her constitutional rights earlier is a Miranda violation. Consequently, the court grants the motion to suppress all incriminating remarks made at the police station to Detective Mills prior to his reading of the Miranda warning.

"Miranda warnings are prophylactic only; they are not constitutional rights in themselves." Weaver v. Brenner, 40 F.3d 527, 534 (2nd Cir.1994) (citation omitted); see Withrow v. Williams, 507 U.S. 680, 690, 113 S.Ct. 1745, 1752, 123 L.Ed.2d 407, 418 (1993). The Supreme Court in Oregon v. Elstad, 470 U.S. 298, 305–09, 105 S.Ct. 1285, 1291–93, 84 L.Ed.2d 222 (1985), held that a noncoercive Miranda violation did not automatically taint any subsequent statements made after the benefit of Miranda warnings. Because Miranda procedural violations are only presumptively coercive but not actually coercive, they do not trigger the "fruit of the poisonous tree" doctrine or the "cat out of the bag" analogy. United States v. Carter, 884 F.2d 368, 372 (8th Cir.1989). Put another way, "[w]here the uncounseled statement is voluntary, and thus not a product of 'inherently coercive police tactics or methods offensive to due process,' id. [Elstad], 470 U.S. at 317, 105 S.Ct. at 1297, there is no fifth amendment violation and the 'fruits' may be admissible in the Government's case in chief." United States v. Sangineto–Miranda, 859 F.2d 1501, 1517 (6th Cir.1988) (citations omitted). The Tenth Circuit recently discussed the Elstad holding in these terms:

Elstad "makes clear that a failure to administer Miranda warnings, without more, does not automatically require suppression of the 'fruits' of the uncounseled

statement." *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1517 (6th Cir. 1988). "Where the uncounseled statement is voluntary, and thus not a product of 'inherently coercive police tactics or methods offensive to due process' ... there is no fifth amendment violation and the 'fruits' may be admissible in the Government's case in chief." *Id.* Similarly, under *Elstad,* "[i]f the unwarned statement was voluntary, and the allegedly tainted second statement was also voluntary, the second warned statement is admissible" since "[t]he Fifth Amendment ... prohibits only the use of compelled testimony." *United States v. Wiley,* 997 F.2d 378, 383 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993). *United States v. McCurdy,* 40 F.3d 1111, 1117 (10th Cir.1994). Thus, Singleton's other post-arrest, post-*Miranda* statements are admissible, if her pre-*Miranda* statements were voluntary or noncoercive and her post-*Miranda* statements were also voluntary or noncoercive. *Id.*

 Statements not obtained in violation of *Miranda* may still be suppressed as violative of due process if the statements are "coerced" or "involuntary." *See United States v. Erekson,* 70 F.3d 1153, 1157 (10th Cir.1995). The government has the burden of proving by at least a preponderance of evidence that a confession was voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972); *see United States v. Robertson,* 19 F.3d 1318, 1321 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); *United States v. Robinson,* 20 F.3d 320, 322 (8th Cir.1994); *United States v. Robertson,* 19 F.3d at 1321 ("In other words, the police must somehow overreach by exploiting a weakness or condition known to exist."). A statement is coerced or involuntary if the action of the "law enforcement officials was such as to overcome the will to resist and bring about a confession not freely self-determined."[5] *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961); *see United States v. Perdue,* 8 F.3d at 1466. Voluntariness is determined from the totality of circumstances including the age, education and intelligence of the accused, the length of detention and questioning, the use of a *Miranda* warning, and the use of any physical punishment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Muniz,* 1 F.3d at 1022.

 The court is quite satisfied that the defendant's pre-*Miranda* or uncounseled remarks were voluntary. There is no evidence that she was coerced, pressured or forced to comment in response to Detective Mills' statement. The court finds no basis for concluding that the environment was coercive, since Singleton was sitting in the interview room, without handcuffs, and with only Detective Mills present. There is no evidence that Detective Mills made any threatening or intimidating gestures or comments to Singleton. The interview lasted only thirty minutes. She was not subjected to any physical punishment or any serious physical deprivations. Finally, Singleton's age, education and intelligence do not suggest any unusual susceptibility to coercion. Her actions prior to the arrest contradict any notions of susceptibility, as she displayed the fortitude required to refuse officers entry into the motel room and to keep officers out of the bathroom while she flushed marijuana down the stool. In sum, the court is convinced Singleton's pre-*Miranda* statements were voluntary.

 In analyzing the voluntariness of Singleton's post-*Miranda* remarks, the court must first consider whether she knowingly waived her *Miranda* rights. *See United States v. Sablotny,* 21 F.3d 747, 750 (7th Cir.1994). "The waiver must have been made with a full awareness both of the na-

---

5. Because "every post-arrest custodial interrogation by the police is in some sense 'inherently coercive,'" the mere fact that the interrogator was a police officer is not enough to show a statement was involuntary. *See United States v. Gale,* 952 F.2d 1412, 1417 (D.C.Cir.), *cert. denied,* 503 U.S. 923, 112 S.Ct. 1302, 117 L.Ed.2d 524 (1992).

ture of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Id.* In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett,* 479 U.S. 523, 530, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987) (quoting *Oregon v. Elstad,* 470 U.S. at 316, 105 S.Ct. at 1296). Once the defendant validly waives her *Miranda* rights, interrogation may continue until the defendant invokes her rights or changed circumstances suggest the responses have become involuntary. *U.S. v. Abreu,* 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd,* 935 F.2d 1130 (10th Cir.), *cert. denied,* 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

 The court finds that Singleton knowingly, voluntarily and intelligently waived her *Miranda* rights. Detective Mills read the warning twice and took the precaution of asking Singleton after each sentence if she understood what he had read. There is nothing of record to suggest that Detective Mills had any difficulty communicating with Singleton. Moreover, the court finds that her subsequent statements were also voluntary. In *Elstad,* the Supreme Court said:

> This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver. . . .

There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case. . . . Certainly, in respondent's case, the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at best. It is difficult to tell with certainty what motivates a suspect to speak. . . . We must conclude that, absent deliberatively coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

470 U.S. at 312–14, 105 S.Ct. at 1294–96. Singleton's cat-out-of-the-bag argument falls under the weight of the holding in *Elstad* that subsequent *Miranda* warnings "ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314, 105 S.Ct. at 1296.

The circumstances in this case are not so unique as to justify departing from the general rule discussed in *Elstad.* There is nothing to suggest that Detective Mills intended his one general statement to cause Singleton to make a complete and uncounseled admission. In fact, there is no evidence that this even occurred. Singleton's pre-*Miranda* statement lasted only two or three minutes, while the entire interview lasted thirty minutes. After Singleton finished her voluntary initial comments, Detective Mills did not respond or follow up with any questions. Instead, he proceeded to read the *Miranda* warning to her. He did not read the warning hurriedly or otherwise attempt to mini-

mize its importance. Instead, he read it twice, and on the second reading he stopped after each sentence and asked her to verbally acknowledge whether she understood what he had just read. Only after Singleton indicated she understood her rights and waived them, did Detective Mills expressly question her about the crimes charged. Finally, the court has no evidence before it that Detective Mills exploited the fact of Singleton's prior unwarned comments or that he otherwise pressured her into making an unfair confession. *See United States v. Lewis,* 833 F.2d 1380, 1388 (9th Cir.1987). In short, there is nothing here that indicates a "deliberate 'end run' around *Miranda.*" *United States v. Gale,* 952 F.2d 1412, 1418 (D.C.Cir.1992).

For all of the reasons stated above, the court finds that the defendant Singleton's post-*Miranda* statements were voluntary. The court denies her motion to suppress as to these statements.

**MOTION FOR DISCLOSURE** (Dk. 18)

■ Singleton requests an order directing the government to disclose any Rule 404(b) evidence that it intends to introduce at trial. In its written response, the government notifies that it might offer prior and subsequent conduct that involves the manufacture and distribution of counterfeit payroll checks or that relates to false statements. At the hearing, defense counsel complained that the government's notice was too general.

The 1991 Advisory Notes to Rule 404(b) state that the pretrial notice requirement was "intended to reduce surprise and promote early resolution of the issue of admissibility." Fed.R.Evid. 404(b) Advisory Notes to 1991 Amendment. The notice need not take a specific form and need only inform the defendant of the "general nature of the evidence of extrinsic acts." *Id.* "[W]hat constitutes a reasonable ... disclosure will depend largely on the circumstances of each case." *Id.*

■ The courts have added that the notice "need not provide precise details regarding the date, time, and place of the prior acts," but it must characterize the prior conduct to a degree that fairly apprises the defendant of its general nature. *United States v. Long,* 814 F.Supp. 72, 74 (D.Kan. 1993). "The notice requirement 'is not a tool for open ended discovery.'" *United States v. Jackson,* 850 F.Supp. 1481, 1493–94 (D.Kan. 1994) (quoting *United States v. Sims,* 808 F.Supp. 607, 610 (N.D.Ill.1992)), *aff'd,* 76 F.3d 1145 (10th Cir.1996). While the government need not produce specific documents or evidence from which the government will introduce the 404(b) evidence, *Jackson,* 850 F.Supp. at 1494, the notice "must be sufficiently clear so as 'to permit pretrial resolution of the issue of its admissibility,'" *United States v. Barnes,* 49 F.3d 1144, 1149 (6th Cir.1995) (quoting *United States v. Long,* 814 F.Supp. 72, 74 (D.Kan.1993)).

The government's notice is too vague and indefinite to satisfy the minimum requirements of Rule 404(b). Such notice offers no chance of a pretrial resolution of the issue of admissibility. The court orders the government to comply with the notice requirement of Rule 404(b) as interpreted above. The defendant's motion for Rule 404(b) disclosure is granted.

IT IS THEREFORE ORDERED that the defendant's motion to suppress evidence (Dk. 16) is denied;

IT IS FURTHER ORDERED that the defendant's motion to suppress statement (Dk. 17) is granted as to the defendant's pre-*Miranda* statement and denied as to all post-*Miranda* statements;

IT IS FURTHER ORDERED that the defendant's motion for Rule 404(b) disclosure (Dk. 18) is granted, and the government shall comply with the notice requirement of Rule 404(b) as interpreted above.